UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim. No. 18-cr-10307-MLW |
| v. | ) | |
| | ) | |
| DAREN DEJONG, | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned Assistant U.S. Attorneys, requests that on May 1, 2019 the Court sentence defendant, Daren DeJong (hereinafter, "defendant" or "DeJong"), to a six month term of imprisonment, a sentence at the low end of the United States Sentencing Guidelines ("Guidelines") as calculated by the parties in their Plea Agreement.

**Facts**

**A.  Introduction**

In early 2017, the Massachusetts State Police ("MSP") began an internal investigation of several overtime programs within what was then known as Troop E.[1] Troop E was primarily responsible for enforcing criminal law and traffic regulations on Interstate-90, the Massachusetts Turnpike ("I-90"), which spans the Massachusetts/New York border to the Boston Harbor.

In early 2018, MSP announced that an internal audit had revealed over 40 Troopers who were suspected of failing to work some or all of the overtime shifts for which they had been paid.

---

[1]    Troop E has since been disbanded and its members and responsibilities absorbed into other MSP troops.

Soon after, the United States Department of Transportation and FBI began an investigation of the suspected overtime abuse.

As a result of that investigation, seven former Troopers (including this defendant) and one former lieutenant were charged with embezzling funds from an agency receiving federal funding, in violation of 18 U.S.C. §666.  As of this date, all eight have pleaded guilty to the charges.[2]  *See* Pre-Sentence Report ("PSR"), ¶6.

### B.    The Abuse of Troop E Overtime Programs

In addition to salary for a regular 8-hour work shift, Troopers within Troop E were also able to earn hourly overtime pay equivalent to 1.5 times their regular hourly pay rate for various overtime assignments.  Depending upon seniority, Troopers were paid between approximately $60-75 per hour, while Lieutenants could make $100 per hour, or more.

One of these overtime programs was the "AIRE" (Accident and Injury Reduction Effort) program.  The objective of the AIRE program was to reduce accidents, crashes, and injuries on I-90 through an enhanced presence of MSP Troopers who targeted vehicles traveling at excessive speeds and exhibiting aggressive driving behaviors.[3]

---

[2]    Former Trooper Eric Chin has been sentenced to one day of incarceration, followed by a one year term of supervised release and former Trooper Gregory Raftery was sentenced to three months' incarceration followed by a one year term of supervised release.  *See United States v. Chin*, 18-cr-10384-RGS; and *United States v. Raftery*, 18-cr-10203-WGY.

[3]    These shifts were 4-hours long and organized by letter according to a specific shift: A-AIRE from 7:30 a.m. to 11:30 a.m.; B-AIRE from 11:00 a.m. to 3:00 p.m.; C-AIRE from 3:30 p.m. to 7:30 p.m.; and D-AIRE from 7:00 p.m. to 11:00 p.m.

Another overtime program was the "X-Team" program. X-Team overtime shifts focused on aggressive driving and were eight hours long, coinciding with existing MSP work shifts, *i.e.*, 7:00 a.m. to 3:30 p.m. (day); 3:00 p.m. to 11:30 p.m. (evening); and 11:00 p.m. to 7:30 a.m. (night).

Troopers were expected to issue a minimum of eight to ten citations for each AIRE shift and twelve to fifteen citations for each X-Team shift. Any failure to issue the required number of citations drew negative scrutiny from supervisors and command staff.

Investigation has revealed that the subjects of this investigation performing AIRE and X-Team overtime routinely and regularly did not work the full four, or eight, hours required. Troopers assigned to these shifts who chose to abuse these overtime benefit would purport to write the minimum number of tickets, and then simply go home. In many instances, these Troopers would obtain the minimum number of citations in an hour, or less.

In other circumstances, such as inclement weather, these Troopers would forgo writing any citations at all. In the event of such weather, policy required Troopers working these overtime shifts to continue to work, *i.e.*, "re-deploy," as directed by superiors. In practice, inclement weather meant neither tickets, nor work, was required for Troopers who chose to fraudulently abuse the AIRE program. Reminiscent of a grade school "snow day," those Troopers treated the AIRE overtime program as if it were a paid holiday.

### Advisory Sentencing Guidelines

**A. The Plea Agreement**

The parties' positions with respect to the Sentencing Guidelines, which are set forth in pages 2-3 of the Plea Agreement, are:

(i)     in accordance with USSG §§ 2B1.1(a)(2), defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of imprisonment of less than 20 years;

(ii)    in accordance with USSG §§ 2B1.1(b)(1)(B), defendant's offense level is increased by two levels because the offense involved a loss in excess of $6,500 but less than $15,000;

(iii)   in accordance with USSG §§ 2B1.1(b)(10), defendant's offense level is increased by two levels because the offense involved sophisticated means;

(iv)    in accordance with USSG §§ 3B1.3, defendant's offense level is increased by two levels because the offense involved the abuse of a position of trust;

(v)     in accordance with USSG §3E1.1, the U.S. Attorney agrees to recommend that the Court reduce by two levels defendant's adjusted offense level because of defendant's prompt acceptance of personal responsibility for the offense conviction in this case.

Accordingly, the parties have calculated the total offense level to be 10.  Mr. DeJong's criminal history category is I, which results in a GSR of 6 to 12 months' imprisonment under the parties' calculations.

## B.      The Pre-Sentence Report

In the PSR, Probation's analysis mirrors that of the parties, except that Probation has determined that the loss in this matter should be calculated to be $31,211.75.  PSR, ¶29.  That difference leads to a further increase of two points to the Guideline calculation, due to a four point increase under USSG 2B1.1(b)(1)(C), because the amount of loss is greater than $15,000, but less than $40,000.

Using those calculations, Probation has determined the total offense level to be 12.  That offense level, with criminal history category I, results in a GSR of 10 to 16 months' imprisonment.[4]

### C.    Relevant Conduct

During the Rule 11 Proceedings on January 28, 2019, the Court indicated that, while the Plea Agreement based its Guideline calculations on conduct occurring in 2016, it requested that the government provide whatever information it had with respect to whether the scheme extended into 2015 or 2017.  *See* Transcript of the Rule 11 Proceedings [D. 44].

On February 4, 2019, the government forwarded to Probation a Statement of Offense Conduct.  In that submission, the government identified a 2016 loss of $14,062.50 as well as an estimated loss for 2015 of $16,099.25.

One week later, on February 11, 2019, the Court issued an Order directing that "the government shall provide forthwith to Probation the information in its possession, custody, or control pertinent to whether there is in this case relevant conduct, to the amount of loss attributable to any such conduct, and to a possible departure pursuant to U.S.S.G. §5K2.21."  [D. 43], p. 4.  The following day, the government provided the Probation Department with an index of materials, a thumb drive, and a breakdown of the dates and hours involved in the 2015 and 2016 loss figures that had been provided on February 4, 2019.

---

[4]     The government has objected to the GSR as calculated by Probation, noting it is bound by the Plea Agreement to calculate the guidelines in accordance with section 3 of the Plea Agreement.

On February 22, 2019, the government supplemented its initial statement of conduct to Probation to include an estimate of $1,050 loss for January 2017, and further, provided a breakdown of the dates and hours underlying that estimate.

### Additional Matters Responsive to the Court's Order

**A.      DeJong's Pension**

In its February 11, 2019 Order, the Court further directed that the parties address "whether DeJong's pension is calculated in part on overtime hours he falsely represented that he worked in 2016 and, if so, the amount by which it was increased."  [D. 43], p. 4.

The government does not believe it can provide a definitive answer to this question of state law.  That said, the government had reviewed publically available materials concerning Massachusetts state pensions.  *See generally*, M.G.L. c. 32, §1 *et seq*.  In specific response to the Court's Order, it would appear that, as a general matter, pensions are calculated based upon base salary, not overtime.  *See* https://www.mass.gov/service-details/how-to-calculate-your-estimated-pension-benefits-msrb (last visited April 14, 2019).

According to news reports, DeJong is collecting a pension in excess of $75,000 annually. See https://www.wcvb.com/article/state-police-overtime-scandal-may-put-pensions-in-jeopardy/23748008 (last visited April 14, 2019).  It is reasonable to expect that DeJong may lose his pension as a result of this conviction.  *See* M.G.L. c. 32, §15.  In this regard, the pension of one former Trooper convicted and sentenced in this matter, Gregory Raftery, has been suspended pending review by the State Retirement Board.  *See* https://www.bostonglobe.com/metro/2019/03/28/state-suspends-annual-pension-for-trooper-overtime-fraud-scandal/zSaGbigeCHtdXNKTal4vCJ/story.html; and

https://www.bostonherald.com/2019/03/28/troopers-pension-suspended-by-state-retirement-board/ (last visited April 14, 2019).

## **ARGUMENT**

DeJong has been a Massachusetts State Trooper for approximately thirty years and was a member of the state police until his retirement in approximately March of 2018.  In 2016, DeJong collected over $16,000 for overtime shifts and hours that he did not work.  To accomplish this fraud, Dejong falsified citations, overtime paperwork, and MSP payroll submissions.

Because MSP required that Troopers working the AIRE and X-Team overtime shifts generate citations, DeJong created bogus citations in order to claim hours that he had not worked.[5] This was accomplished in a number of ways.  In some instances, DeJong created bogus citations for upcoming overtime shifts, and, on at least one occasion, DeJong created bogus citations two days after the fact, in order to justify being paid for an AIRE overtime shift that he had not worked.

In many instances, when a C-AIRE overtime shift (3:30 p.m. – 7:30 p.m.) followed his regular shift (7:00 a.m. – 3:30 p.m.), DeJong spent time during the last hours of his regular shift obtaining information he needed to create bogus citations.  An hour or more before the end of his regular shift, Dejong would stop individuals, and/or run driver's histories, and would create bogus citations which he would then claim had been written during the AIRE overtime shift.[6]

---

[5]      As noted above, Troopers were generally required to issue eight to ten traffic citations per AIRE shift and twelve to fifteen citations per X-Team overtime shift.

[6]      The First Circuit has held that the sophisticated means enhancement is appropriately applied in cases involving numerous, even repetitive, steps, regardless of whether each step was itself sophisticated. *United States v. Foley*, 783 F.3d 7, 25 (1st Cir. 2015) (and cases cited).  The many steps involved in this scheme, some or all of which were undertaken for each fraudulent

DeJong's conduct on January 24, 2016, exemplifies how the scheme would unfold in those circumstances. On that day, payroll records reflect that DeJong worked his regular shift (7:00 a.m. – 3:30 p.m.) followed by a C-AIRE overtime shift (3:30 p.m. – 7:30 p.m.). To be paid for that overtime shift, DeJong submitted an AIRE Activity Card in which he claimed:

> (1) to have worked the "C" AIRE overtime shift (3:30 p.m. – 7:30 p.m.);
> (2) to have written 8 motor vehicle citations during the shift;
> (3) to have performed 1 "assist;"[7] and
> (4) to have done this work in Cruiser 354E.

DeJong also submitted copies of the eight citations he claimed to have written during the AIRE overtime shift as further evidence he had worked those hours. Those citations purported to have been written between 2:35 p.m. and 3:50 p.m.

The evidence shows that DeJong did not work the AIRE overtime shift at all that day. First, according to RMV records, there were no records showing that any of the citations were issued to real drivers on January 24, 2016.[8] Second, CJIS records reveal that DeJong ran the driver's histories of the individuals he supposedly ticketed during the AIRE overtime shift during his regular shift, *i.e.*, between 1:58 p.m. and 2:25 p.m.[9] Similarly, the radio data for Cruiser 354E

---

overtime shift throughout the year, "make [DeJong's] scheme more effective and difficult to thwart, and it is enough to justify the enhancement." *Foley*, 783 F.3d at 25 (quotation omitted).

[7]    "Assists" could involve such matters as aiding disabled motorists or backing up other Troopers on motor vehicle stops.

[8]    Each citation has five copies, including the "Agency Copy" that was submitted to MSP in order for Troopers to be paid for AIRE overtime shifts. The absence of any other record of these citations demonstrates that DeJong destroyed or disposed of copies of these citations that should have gone to the operators, courts, and RMV.

[9]    Troopers typically run the driver histories of individuals whom they stop **after** a Trooper stops a motor vehicle (to check for outstanding license suspensions, warrants, etc.). Here,

showed that DeJong's cruiser was turned on at 5:09 a.m. and turned off at 2:55 p.m., thirty five minutes before the AIRE overtime shift even began.  The cruiser was not turned back on until 7:27 a.m., the following day, when DeJong's Paystation records reflect he began working a detail at approximately 8:00 a.m.  Thus, the entire time that DeJong claimed to be working an AIRE overtime shift, from 3:30 p.m.-7:30 p.m., DeJong's cruiser was off – signifying that he was not driving his cruiser.

On another occasion, the evidence shows that DeJong created bogus citations two days after an AIRE overtime shift he did not work.   Payroll records for August 29, 2016 reflect that DeJong had a day off,[10] yet worked an "A-AIRE" overtime shift from 7:30 a.m. – 11:30 a.m. that day.  To be paid for that overtime shift, DeJong submitted an AIRE Activity Card in which he claimed:

(1) to have worked the "A" AIRE overtime shift (7:30 a.m. -11:30 a.m.);
(2) to have written 10 motor vehicle citations during the shift;
(3) to have performed 3 "assists;" and
(4) to have done this work in Cruiser 354E.

---

DeJong ran driver histories more from thirty minutes up to an hour and twenty-five minutes **before** the drivers were supposedly stopped (according to the times written on the tickets submitted to MSP).

[10]     As will be relevant to assessing the radio data below, payroll records also indicate that, through a combination of personal days, vacation days, and regular days off, DeJong did not work his regular shift from August 25, 2016 through August 29, 2016.

MSP has located and provided copies of nine citations[11] DeJong claimed to have written during the AIRE overtime shift. Those citations purported to have been written between 7:05 a.m. and 8:45 a.m. on August 29, 2016.

The evidence shows that DeJong did not work the AIRE overtime shift at all on August 29, 2016, and instead, backdated bogus citations created on August 31, 2016. First, according to RMV records, there were no records showing that any of the nine citations were issued to real drivers on August 29, 2016. Second, no drivers' histories were checked on August 29, 2016. Instead, DeJong did not run the plates and/or driver's history of the individuals who he claimed to have ticketed on August 29, 2016 until August 31, 2016.[12] Similarly, the radio data for Cruiser 354E showed that DeJong's cruiser radio turned off on August 26, 2016 at 7:53 a.m. and did not turn back on until August 30, 2016 at 8:15 a.m. (consistent with the payroll records showing days off throughout that period). Thus, the entire time that DeJong claimed to be working an AIRE overtime shift, from 7:30 a.m. to 11:30 a.m. on August 29, 2016, DeJong's cruiser was off – signifying that he was not driving his cruiser.

Investigators found this pattern of fraud throughout DeJong's MSP records for 2016 (*i.e.*, cruiser radio data, CJIS data, MSP paperwork, etc.). Investigators have determined that DeJong

---

[11]    While the AIRE Card lists ten citations, the government believes only nine tickets were submitted for that day. Tickets are, as a general matter, issued in numerical sequence. The citations in numerical sequence prior to the nine issued on August 29, 2016 were issued on August 24, 2016, and the sequence of tickets immediately following the nine tickets issued on August 29, 2016, were issued on August 31, 2016.

[12]    The driver's histories of the individuals that DeJong claimed to have ticketed during the August 29, 2016 AIRE shift were run on August 31, 2016 between 7:12 a.m. and 7:43 a.m. (during DeJong's regular shift that day).

was not present for approximately 140.25 hours of AIRE and 47.25 hours of X-Team overtime in 2016.[13]  At a rate of $75 per hour, the loss to the MSP for 2016 totaled $14,062.50.

<u>**Conclusion**</u>

Few crimes strike at the core of the justice system more than those involving law enforcement officers who choose to break, rather than uphold, the law. Though at its heart a crime motivated by simple greed, it is far more troubling than the run of the mill fraud cases in this court. This crime, and the abusive culture it served to perpetuate, reflect a betrayal of the trust and power granted to those who serve in law enforcement.

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the conduct; dictate a sentence of six months incarceration, a one year term of supervised release, a fine within the Guideline sentencing range calculated by the Court (unless the Court finds that the Defendant is not able to pay a fine) and the payment of restitution to the MSP.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Mark Grady*
MARK GRADY
DUSTIN CHAO
Assistant U.S. Attorneys

---

[13]     In or about 2016, DeJong's total MSP compensation was approximately $179,971, which included approximately $63,394 in overtime pay, a portion of which included pay for AIRE and X-Team overtime shifts.  In or about 2016, DeJong signed up for and received overtime pay for more than 164 AIRE overtime shifts and 13 X-Team overtime shifts.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Mark Grady*
MARK GRADY
DUSTIN CHAO
Assistant U.S. Attorneys

Date:   April 17, 2019