UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Docket No. 1:18-cr-10307-MLW |
| DAREN DEJONG ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM IN AID OF SENTENCING

Defendant Daren DeJong ("DeJong"), by and through undersigned counsel, submits this memorandum in conjunction with his sentencing scheduled for May 1, 2019. DeJong respectfully avers, as set forth in greater detail herein, a sentence of a one (1) year term of probation to include as specific conditions that he serve six (6) months in home confinement along with the payment of mandatory restitution in the amount of $14,062.50 is "sufficient, but not greater than necessary" to achieve the purposes of the Sentencing Reform Act.

### ARGUMENT

**I.   Applicable Law**

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory. The Sentencing Reform Act requires the Court to consider guidelines ranges, *see* 18 USC § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care. 18 USC § 3553(a). Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of

sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. *Id.*[1]

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all of the factors under 18 USC § 3553(a). *Id*. Ultimately, the sentencing judge must select a sentence within the statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress. 18 USC § 3553(a); *see also* 18 USC § 3553(a)(1)-(2).

The First Circuit has summarized the central principles of the post-*Booker* and -*Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II.   Advisory Guideline Calculations

---

[1] Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines. Sentencing courts previously were forbidden from considering, *inter alia*, a defendant's history and characteristics to the extent that they involved his mental and emotional condition, USSG § 5H1.3; his education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12. These factors can now support a sentence outside the guidelines.

On January 28, 2019, DeJong pleaded guilty to one (1) count of embezzlement from an agency receiving federal funds, in violation of 18 USC § 666(a)(1)(A), which carries a maximum penalty of ten (10) years' imprisonment. Pursuant to the plea agreement, the parties have calculated DeJong's adjusted offense level as follows: DeJong's base offense level is six (6) because the statutory offense of conviction has a statutory maximum term of imprisonment of less then twenty (20) years. *See* USSG § 2B1.1(a)(2). A 2-level enhancement applies because the agreed upon loss is less than $15,000, specifically $14,062.50. *See id.* § 2B1.1(b)(1)(B). Two additional 2-level enhancements apply because the offense involved sophisticated means, *see id.* § 2B1.1(b)(10), and because DeJong abused a position of trust. *See id.* § 3B1.3. Finally, the government has agreed to recommend the Court apply a 2-level reduction because of DeJong's prompt acceptance of responsibility. *See id.* § 3E1.1. The parties' guideline calculation therefore results in a total offense level ("TOL") of 10, a criminal history category I, and a resultant guideline sentencing range ("GSR") of 6 to 12 months' imprisonment.

By order of this Court, the government conducted a further analysis of the records in its possession for 2015 and 2017 because the analysis it conducted to reach the agreed-upon loss amount was predicated solely on its analysis of 2016. As a result of their further analysis, which the government submitted to U.S. Probation in connection with its Presentence Investigation, U.S. Probation, by including 2015 and 2017, has calculated the total loss to be $31,211.75. *See* PSR ¶29. According to U.S. Probation, this raises DeJong's total offense level to 12 with a corresponding GSR of 10-16 months' imprisonment.[2] *Id.* at ¶84.

---

[2] Although this would place DeJong's TOL within Zone C which requires the imposition of a sentence of imprisonment that may not be substituted for a term of home confinement *in toto*, the Supreme Court in *Gall*, two (2) years after its decision in *Booker*, made clear that even that aspect of the guidelines was also advisory. *See Gall*, 552 U.S. at 58-59 & n. 11 ("If the Guidelines were still mandatory, and assuming the facts did not justify a Guidelines-based downward departure,

DeJong respectfully requests this Court use the GSR contemplated by the parties in the plea agreement as its starting point when fashioning the appropriate sentence for this case and this defendant. The plea agreement in this case was the product of careful negotiations between the parties. During those negotiations, the government agreed to limit its focus, if DeJong were to agree to the indictment as charged and, if so agreed, stated it had no intention of conducting a further analysis of any other years.[3] While the government could not bind itself in a written agreement not to conduct such a further investigation, the government's clear expression of its intent was central to the decision to enter into the agreement the parties formed. As a result, when the plea agreement was executed (and at the time of DeJong's change of plea), the full scope of loss for any other year was unknown to the parties. Inasmuch as this Court is rightfully entitled to as complete a picture as possible of the information the government possesses relative to DeJong's

---

this would provide a sufficient basis for setting aside Gall's sentence because the Guidelines state that probation alone is not an appropriate sentence for comparable offenses... But the Guidelines are not mandatory, and thus the "range of choice dictated by the facts of the case" is significantly broadened. Moreover, the Guidelines are only one of the factors to consider when imposing sentence, and § 3553(a)(3) directs the judge to consider sentences other than imprisonment.").

[3] The government and DeJong entered into post-indictment plea negotiations in October, 2018 after the government informed undersigned counsel it would likely to supersede his current indictment by adding liability for 2015. In proposing the current plea, the government stated, were they to do so, they were prepared to conduct a full and complete review of the defendant's, and his wife's, financial transactions for 2015, including credit card statements. During plea negotiations conducted within a hard timeline by which DeJong was asked [by the government] to decide, undersigned counsel asked whether the government would promise in writing it would not pursue liability for 2015 or any year outside the scope of the indictment as it then-existed (and to which DeJong ultimately pleaded guilty). The government replied, in essence, that they cannot promise what they did not know; in order to make such a promise, they would need to look into 2015 and whatever they found they would be required to report to Probation as relevant conduct, pursuant to USSG § 1B1.3. They stated further that, by contrast, were DeJong to agree to the plea as proffered, they would stop their analysis where they had rested and move on. Undersigned counsel shared these statements with DeJong; they were determinative in his decision to plead guilty. DeJong and undersigned counsel both credit, and appreciate, the fact that government has continued to honor its signed agreement.

offense conduct, so too is the ability of the government (whose investigation was entirely separate and apart from any conducted by the Commonwealth of Massachusetts) and any defendant entitled to engage in good-faith negotiations aimed toward, and calculated to bring about, a knowing, final and complete resolution. There is no question this Court enjoys the authority and discretion to require the government to fully assess relevant conduct. That this Court insisted that be done here no doubt served a compelling purpose in that it sent a strong message that a blind eye must not be turned to any amount of corruption once discovered. Nonetheless, undersigned counsel respectfully, and humbly, submit that the use of that information, which on information and belief was not yet developed and purposefully removed from the parties' calculus in order to reach an agreement in good faith, to raise the starting point used for determining any defendant's sentence may send a message of unintended consequence that could do harm to future negotiations between the government and those accused. Undersigned counsel therefore respectfully urge this Court, the import of its message having now been heard by the community to which it was directed, to employ its sound discretion and give effect and credit to the plea agreement carefully negotiated by the parties in good-faith.

Additionally, it should be noted that undersigned counsel have lodged a written objection to the calculation of loss, as limited to 2015. While the government's careful investigation amply establishes both that there were a number of hours DeJong did not work for which he was paid, and that he had falsified citations in order to help conceal what was happening, the government's specific methodology for calculating those exact number of hours appears to be premised solely on the number of hours between the first time DeJong's cruiser's radio established a connection and when that connection was disconnected. Undersigned counsel recognize the methodology employed is favorable to DeJong in some respects, while in some ways it is also disfavorable to

him in others. Undersigned counsel also recognize that ultimately this Court would be required to make a reasonable estimate of the loss based on a preponderance standard. As such, this is, accordingly not an objection undersigned counsel intend to press at sentencing. Instead, they raise this objection simply to point out they do not believe there is an entirely reliable way of estimating the hours DeJong was and was not working in 2015, at least not one that involves such precision of analysis to allow for the use of decimals (note, the government determined loss for 2016 involved 140.25 hours of AIRE shifts, which suggests a greater level of precision).

Indeed, this reality of the government's methodology actually underscores why particular weight ought to be accorded the parties' plea negotiations. Just as much as a plea negotiation conducted to come to terms regarding an appropriate amount of loss is an imperfect process, so too is the government's methodology for determining loss under the guidelines. This Court's order following DeJong's Rule 11 hearing ensured that the outcome of those negotiations was the product of a fair assessment of his relative culpability. As set forth more fully below, the government's investigation implicated seven other officers. That said, systemic abuse involving some degree of sophistication to avoid detection by multiple members within the context of a hierarchical bureaucracy does not spring into existence within a single calendar year of its own accord. That a loss was sustained in 2015 is entirely unsurprising and was contemplated as an almost-certainty by both parties when it came to its agreement to plead guilty to 2016 conduct, alone. The question therefore, it would seem to undersigned counsel, devolves to whether the Sentencing Commission's directive to use loss as a one-size-fits-all proxy for culpability makes any real sense as the starting point in this context, or whether the range envisioned by the parties and the product of their negotiations with a particular understanding of the circumstances of this case ought to be accorded greater deference. The government stands by the plea agreement just as

much as undersigned counsel do. It is therefore respectfully requested this Court adopt the starting point the parties believed would be appropriate when their agreement was reached.

**III.   The Requested Sentence Is Sufficient, But Not Greater Than Necessary, To Comply With The Statutory Purposes Set Forth In Under the Sentencing Reform Act.**

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *United States v. Jiménez-Beltre,* 440 F.3d 514, 518-19 (1st Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodríguez*, 527 F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough v. U.S.,* 552 U.S. 85, 101 (2007). That tenet – the "parsimony principle" – instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.*, quoting 18 USC § 3553(a).

DeJong's offense conduct is without question deeply disconcerting and deserving of punishment. It is respectfully submitted, however, that the contours of that punishment ought to be shaped by the nature of DeJong's long and distinguished service in law enforcement which preceded the offense, as well as the circumstances out of which his offense conduct arose, his recent efforts to take responsibility for both its commission and its remediation, his personal circumstances at present, and also all the prior sentences imposed upon similarly situated officers. The sentence recommended herein, a one (1) year term of probation, to include a specific condition that he be held on home confinement for six (6) months, and the fact he will be required to make restitution in the amount of $14,062.50, undersigned counsel submit, appropriately balances the various § 3553 factors and thereby achieves the aims of sentencing.

   **A. Offense Conduct**

As set forth in the government's sentencing memorandum, the Massachusetts State Police ("MSP") initiated two (2) overtime programs: the so-called "AIRE" (Accident and Injury Reduction Effort) and "X-Time" programs. These programs, which were 4-hour and 8-hour long shifts, respectively, were intended to incentivize MSP Troopers to work additional hours and thereby increase Trooper presence along the Massachusetts Turnpike ("I-90"). During these shifts, Troopers were responsible for traffic enforcement and were expected to target aggressive drivers and speeding. In order to justify the additional cost of deploying additional Troopers for overtime shifts, the Troopers were expected to write eight (8) to ten (10) citations during their AIRE shift and twelve (12) to fifteen (15) citations during their X-Team shift or be subject to reprimand by commanding officers.

DeJong has admitted to abusing these overtime shifts by receiving overtime pay for hours he did not work. Some days, DeJong worked fewer overtime hours than he claimed he had worked, while others DeJong did not work at all. To make it appear he was working these hours as well as to meet his ticket quota, DeJong also admitted he submitted traffic citations which had been falsified in some way, for example, by fabricating them altogether by running license plates for motorists he did not stop during his normal shift, or by altering the date/time in which a citation had been issued to match overtime hours he claimed to have worked.[4] Pursuant to the Plea Agreement, in this case, the parties have agreed the number of overtime hours for which DeJong was paid but did not work was 140.25 hours of AIRE shifts and 47.25 hours of X-Team shifts over the course of 2016. DeJong was paid approximately $75 per hour resulting in a loss to the MSP of $14,062.50 during that year.

---

[4] Because the tickets were never submitted to the RMV, motorists were not actually cited or fined; their driving records were not affected.

██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

[Page content redacted]

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████

   ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

   ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

[redacted]

### C. DeJong's Service in Law Enforcement

DeJong began his career in law enforcement in 1984 when he was hired by the Northbridge Police Department as a permanent intermittent police officer, a position he held while also working full-time for Duggan Construction. In the spring of 1985, DeJong earned a Bachelor of Science in Criminal Justice from Bryant College and a year later he left Northbridge PD to attend the Massachusetts State Police Academy. He graduated second in his class in December, 1986 (and

first in physical fitness, having set a state police record for number of push-ups in a minute). DeJong worked briefly for the State Police but decided to return to Northbridge PD in 1987. However, in May, 1992, in the wake of fiscal shortages and in the face of threatened layoffs, DeJong returned to the State Police (where he was initially assigned to the SP Lee barracks, an over one hundred (100) mile commute from his residence in Uxbridge where he was raising young children). He left Northbridge PD after five (5) years of service, which included a stint in an undercover capacity for the Southern Worcester County Drug Task Force, with no incidents or negative complaints. After thirty-two (32) years' service as a full-time police officer, twenty-seven (27) of which were with State Police, DeJong retired in March, 2018 after being advised of the internal affairs investigation which gave rise to the instant prosecution. The following highlights of that career are offered, not to excuse the criminal conduct DeJong engaged in toward the end of this career, but to provide a more complete account of the otherwise selfless service he performed during his three-decades tenure as a police officer:

- In the fall of 1989 the Northbridge PD, in conjunction with the National Guard Air wing, conducted flyovers of Northbridge in search of marijuana grow operations. One was located by DeJong who later executed a search warrant for the premises which required him to enter swampland to recover the marijuana plants. While wading through the swamp, he inadvertently made contact with a submerged fishing line which was connected to a car bomb secured to a tree and used to power makeshift pipe bomb. The pipe bomb's area of effect upon detonation narrowly missed his legs, the sound of which caused DeJong to believe he was being fired at by someone with a shotgun. The owner of the premises was later convicted of narcotics charges and for placing improvised explosive devices.

- In the summer of 1989, DeJong responded to a report of a vehicle overturned in Meadow Pond located in Whitinsville where people could be heard screaming from the water. DeJong, with the assistance of another officer, immediately dove into the pond while dressed in full uniform and was able to save two (2) of the three (3) occupants. Despite repeated attempts to free him, the operator of the vehicle died while submerged. His body was recovered by an underwater rescue team deployed by the local fire department.

- In the fall of 1992, DeJong, who was off-duty and driving home from a run at a nearby track in his personal vehicle, observed an individual who had escaped from Milford District Court three (3) days prior; the individual was wanted in both Massachusetts and Rhode

Island. DeJong was able to identify this man having previously arrested him. He called for backup but, after five (5) minutes, fearing the man would escape, attempted to effectuate his arrest and was able to subdue him until Uxbridge PD arrived to place the man in handcuffs. DeJong received a commendation for this arrest the following year.

- In 1993, DeJong was transferred to SP Sturbridge, which was known as one of the largest drug interdiction barracks in the Commonwealth due to its proximity to I-84, where he was assigned as the court/narcotics evidence officer. While working with the Narcotics Inspection Unit, DeJong conducted research to determine that the evidence locker had been storing evidence from some three hundred fifty (350) closed narcotics cases dating as far back as 1970. At DeJong's recommendation, changes were implemented at SP Sturbridge to the barracks' handling and storage of narcotics evidence.

- In 1996, DeJong was dispatched to a non-denominational church in Brimfield to respond to a report of a missing priest. The church was located on a farm. During a search of the property DeJong discovered a large amount of coagulated blood in one of the fields and requested all parishioners remain inside the church. The priest's body was later found on power lines approximately a half-mile away from the church; one of the parishioners, a parolee on a work-release program, was charged with the priest's murder. DeJong's testimony proved crucial at a trial which culminated in a murder conviction.

- In the summer of 2005, DeJong was the first to respond to an assault of members of the "Outlaw" motorcycle gang by members of the Hell's Angels at the westbound Charlton Service Plaza. An altercation had apparently erupted when one of the Hell's Angels members struck one of the Outlaw members, an enforcer for the gang, while he was fueling his motorcycle; this apparently was in retaliation for a shooting homicide of a Hell's Angels member a month prior. When DeJong arrived, one of the Outlaw members was found near the doors to the store front after being beaten by Hell's Angels members who had used their helmets as weapons. DeJong put out a BOLO and approximately fourteen (14) Hell's Angels members were later stopped and arrested. Six of them were later identified as the responsible parties with the help of a witness to the assault who reviewed an array of potential suspects put together by DeJong. A state-wide crackdown on motorcycle gangs ensued which targeted the Hell's Angels in particular, resulting in multiple arrests throughout the summer.

- On March 16th, 2016 Trooper Thomas Clardy was struck and killed while working an AIRE shift on I-90 near Charlton. DeJong, who knew Tpr. Clardy well and was friendly with him and his family, responded to the scene. He and Trooper Todd Glidden accompanied Tpr. Clardy's totaled cruiser and the responsible motorist's vehicle as evidence to headquarters. DeJong reports this incident took a particularly acute emotional toll on him.

- In April, 2017, DeJong assisted Lt. James Canty with a stop for a potential narcotics OUI. When the motorist refused to exit his vehicle, DeJong attempted to unlock the front driver's side door. While reaching over the driver's window, which had been shattered, the motorist grabbed hold of DeJong's arms and dragged them over the glass. DeJong received stitches

to suture multiple lacerations caused by the glass; the motorist pleaded guilty to OUI charges.

- On May 30, 2017, DeJong participated in a high-speed chase originating in Auburn as the "lead chase" vehicle. The suspect, successfully evaded arrest by Auburn PD for an attempted narcotics sale after being tasered twice, led the State Police on an approximately twenty (20) mile chase before crashing his vehicle on an off-ramp from I-495. Thereafter, the suspect exited his vehicle, threw a firearm at another trooper, and was arrested by DeJong without further incident.

- On March 19, 2018, the day before DeJong was placed on administrative leave, he and Trooper Kevin O'Brien responded to a report of a possible body in the roadway on I-90 near Grafton. When DeJong arrived, he found a male hovering over a body that was supine along the line dividing the breakdown and right travel lanes. The man, DeJong learned, was with the body of his seventeen (17) year old daughter, who he had found after searching for her during the night. It appeared to DeJong that she had jumped from the overpass onto I-90. After her body was recovered, DeJong stayed with the man in his cruiser and attempted to comfort him; DeJong feared for the man's safety due to his understandably broken emotional condition. The father explained to DeJong that his daughter was on the National Honor society and was set to travel across country for a national robotics competition. The following week, DeJong and Tpr. O'Brien attended the young woman's wake.

While the foregoing, as noted at the outset, in no way excuses DeJong's offense conduct, the nature of his career strongly suggests his state of mind and motivations underlying that conduct was aberrational and incongruous to his professionalism and commitment to duty. The fact that the acts he committed were done within the context of a rigorously enforced citation quota system also suggest they were unlikely motivated by greed. The incidents outlined above amply demonstrate that DeJong sacrificed much, and otherwise performed his duties admirably, over the course of his long career. Undersigned counsel respectfully submit this Court, when fashioning an appropriate sentence, should also consider whether a term of incarceration at a federal prison is truly "sufficient but not greater than necessary" for his offense conduct when weighed against the balance of his lengthy career in law enforcement.

    D. **Comparative Sentencing**

Thus far, Gregory Raftery and Eric Chin are the only other indicted troopers who have been sentenced as of the date of this filing. Raftery's plea agreement reflects a restitution amount—$51,337—substantially greater than what was calculated for DeJong even after inclusion of 2015. He was sentenced to a term of three (3) months' imprisonment followed by one (1) year of supervised release.  Likewise, Chin, who also had a total offense level of 10, was sentenced to one (1) day of incarceration deemed served, followed by one (1) year of supervised release.  A similar case, prosecuted in Suffolk County, in which Sergeant William J. Woodley of the Boston Police Department resigned after "fraudulently collecting nearly $13,000 in overtime he never worked between June and October 2016" should also be considered for comparative sentencing purposes.[8] Pursuant to a plea agreed to by the Suffolk County District Attorneys Office, Woodley was sentenced to an eighteen (18) month continuation without a finding which included as a condition that he repay the money he collected.  By virtue of this particular disposition, his case will be dismissed at the end of that time and his record "wiped clean" of conviction. Finally, each of the plea agreements of the other indicted troopers who have not yet been sentenced have similar restitution amounts as DeJong and all contain the same recommendation by the government.  It is respectfully submitted the proposed sentence here, a one (1) year term of probation which includes as a condition that he be subject to six (6) months of home confinement, would constitute a sentence on a parity with those fairly anticipated in other cases, particularly when juxtaposed with those that were actually imposed in the case of Raftery, Chin and Woodley.

---

[8] *See Charges Against Boston Officer Disappear After Private Court Hearing*, Wallack, T. Boston Globe, December 8, 2018. <available at https://www.bostonglobe.com/metro/2018/12/07/charges-against-boston-police-officer-disappear-after-private-court-hearing/BzDUiCcGPd9kdpaoJcu2XN/story.html> Because the charges covered a mere four (4) months period, it can be assumed, but is neither alleged nor established, there may have been "relevant conduct" in his [state] case as well.

### E. Present Circumstances & Summary

DeJong dedicated his entire life to his career in law enforcement. He resigned from the force under what can only be described as disgraceful circumstances and has felt at times insurmountable shame at the conduct which has tarnished, not only his own reputation, but also that of the institution he gave his life to serving. Since the time of his indictment, he has faced significant public ridicule and has even received hate mail at his residence. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Not only this but as a result of his plea, DeJong now faces the near-certainty he and his family will be deprived of his thirty-two (32) years accrued pension in light of his conviction; other troopers already are under review by the state Retirement Board for the same misconduct.[9] Despite no promises of leniency, however, DeJong has made an effort to make things right to the best of his ability and will continue to do so regardless of any sentence this Court might impose.

The letters of support filed herewith amply support a view of a selfless law enforcement professional, loving father and husband to two (2) adult men (one of whom followed in his father's footsteps and is employed as a trooper with the MSP), who has served the Commonwealth for over thirty (30) years with dedication, honor and loyalty. He respectfully submits a sentence to a one (1) year term of probation which includes a specific condition that he serves six (6) months in

---

[9] The government correctly points out that DeJong's pension is based upon his straight salaried pay, and not on detail or overtime pay.

home confinement, and also pay restitution in the amount of $14,062.50, appropriately balances the tapestry of factors set forth in 18 USC § 3553.

## CONCLUSION

Based on the foregoing, DeJong respectfully requests this Honorable Court sentence him to a one (1) year term of probation which includes, as a condition, that he serves six (6) months in home confinement, as well as restitution in the amount of $14,062.50. In the event this Court imposes a sentence of incarceration, he respectfully requests a judicial recommendation to the Bureau of Prisons that he be designated to the Camp at FMC Devens so he may be confined as close as possible to his wife and children, and also that he be granted the ability to self-report within forty-two (42) days to any facility to which he may be designated.

Dated: April 19, 2019

                                         Respectfully submitted,
                                         DAREN DEJONG
                                         By and through his attorneys,

                                         /s/ *R. Bradford Bailey*
                                         R. Bradford Bailey, BBO#549749
                                         Adamo Lanza, BBO#689190
                                         BRAD BAILEY LAW, P.C.
                                         10 Winthrop Square, 4th Floor
                                         Boston, Massachusetts 02110
                                         Tel.: (857) 991-1945
                                         Fax: (857) 265-3184
                                         brad@bradbaileylaw.com

### Certificate of Service

I, R. Bradford Bailey, hereby certify that on this the 19th day of April, 2019, I caused a true copy of the foregoing motion to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

                                         */s/ R. Bradford Bailey*
                                         R. Bradford Bailey, Esq.