UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )   Criminal Action
v.                            )   No.  18-10307-MLW
                              )
DAREN DeJONG,                 )
                              )
          Defendant.          )
                              )
```


* * * * * E X C E R P T * * * * *
(Sidebar removed)


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


SENTENCING

May 2, 2019


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
Dustin Chao
Mark Grady
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3227
dustin.chao@usdoj.gov
mark.grady@usdoj.gov


On Behalf of the Defendant:
R. Bradford Bailey
Adamo L. Lanza
Brad Bailey Law, P.C.
44 School Street
Suite 1000B
Boston, MA 02108
781-589-2828
brad@bradbaileylaw.com

P R O C E E D I N G S

(Case called to order.)

THE COURT:  Good morning.  Would counsel please identify themselves for the court and for the record.

MR. GRADY:  Good morning, Your Honor.  Mark Grady on behalf of the United States.  With me is Assistant United States Attorney Dustin Chao.

MR. BAILEY:  Good morning, Your Honor.  Brad Bailey for Daren DeJong, who is seated at counsel table to my right.

MR. LANZA:  Good morning, Your Honor.  Adamo Lanza on behalf of Daren DeJong.

THE COURT:  Thank you.  I apologize for starting a little late, but there were some things I wanted to look at more closely.

Mr. Grady, in the Presentence Report the Massachusetts State Police is identified as the victim of the fraud in this case.  Has the government notified the State Police of its right to submit a letter and/or to be heard today?

MR. GRADY:  Yes, Your Honor.  The government has been in communication with the counsel's office for the State Police throughout the proceedings, and a representative of the State Police, Detective Lieutenant Anna Brooks of the State Police Internal Affairs department, is present today, but I do not expect her to speak.

THE COURT:  Well, if Ms. Brooks would like to be

heard, after the guideline range is calculated or perhaps in
this case tentatively calculated, I'll offer her an opportunity
to speak.  Well, actually, where is she?

MS. BROOKS:  Good morning, Your Honor.

THE COURT:  Good morning.  Do you wish to be heard in
this proceeding about the impact on these proceedings -- the
impact of this case on the Massachusetts State Police?

MS. BROOKS:  No, Your Honor.

THE COURT:  All right.  In connection with the
sentencing, I have the Presentence Report with the parties'
objection to the guideline calculation, the government's
sentencing memo, the defendant's sentencing memo, about a dozen
letters on behalf of the defendant, the release status letter.
I've looked at the indictment and the plea agreement again as
well as the transcript of the change of plea colloquy.

Is there anything else I should have received and
read?

MR. GRADY:  Nothing, Your Honor, except what the
government provided to Probation in response to the court's
order.

THE COURT:  Yes.  And actually, I have that
information but haven't delved into it.

MR. BAILEY:  I believe you have everything from the
defense, Your Honor.

THE COURT:  Mr. Grady, let me ask you this.  In your

1  sentencing memo on page 7, this is docket number 46, you wrote,

2  "In 2016 DeJong collected over $16,000 for overtime shifts and

3  hours that he did not work."

4      MR. GRADY:  I apologize, Your Honor.  That transposed

5  the 2015 figure for the 2016 figure.  It should be the $14,000.

6      THE COURT:  Okay.  So that essentially --

7      MR. GRADY:  Just a typo between the two years, Your

8  Honor.  I apologize to the court.

9      THE COURT:  That's what I thought but I wasn't sure.

10 All right.  Now, on April 29, essentially with the agreement of

11 the defendant, I unsealed the sentencing memorandum that had

12 been filed under seal with the redacted version for the public

13 record.  The most substantial information in the now unredacted

14 sentencing memo relates to Mr. DeJong's proffer to the Attorney

15 General's Office.  The information he provided to assist in its

16 investigation, continuing investigation, as I understand it, of

17 Troop E of the Massachusetts State Police.

18      I redacted information that appeared to me would

19 identify people who have not been indicted that the defendant

20 discussed because, as I said, I didn't anticipate that they

21 would have an opportunity to contest his statements in this

22 proceeding, although it's conceivable they might.

23      But anyway, I also said I would consider de novo,

24 fresh, any motion to unseal the limited information that

25 remains redacted.  I haven't received any motion or request to

1  unseal that, but I'll continue to consider whether redactions

2  that I allowed to remain in or proposed are justified.  It

3  depends, perhaps on the evolution of this hearing.

4        As always I'd like to try to assure that we have a

5  clear and common sense of the legal framework for sentencing.

6  It is as was succinctly stated by the Supreme Court in Gall in

7  2007.  I have to begin by correctly calculating the guideline

8  range.  The correctly calculated guideline range is the

9  starting point for determining the sentence.  However, I may

10  not presume that that range is reasonable.  Rather I have to

11  listen to the arguments of the parties and anything that

12  Mr. DeJong may say, I have to consider all of the section

13  3553(a) sentencing factors and decide what sentence is

14  sufficient and no more than necessary to serve the statutory

15  purposes of sentencing.  If there's a departure or a variance,

16  a substantial departure or variance requires a more significant

17  justification than a minor one.  And in any event, I have to

18  explain the reasons for my sentence.

19        Do the parties agree that that's the legal framework?

20        MR. GRADY:  Certainly no objection to that framework,

21  Your Honor.

22        MR. BAILEY:  The defense agrees that's the legal

23  framework.  And for clarity, Mr. Lanza will handle the

24  calculations piece.  However, to the extent that this court may

25  ask more about the underlying negotiations that got us to the

1   offense level in the plea agreement, I will be ready to address

2   that if this court has questions because I directly

3   participated in those discussions.

4          THE COURT:  Okay.  And that is permissible.  All

5   right.  And we're operating under the manual with the

6   guidelines now in effect, that is, with the amendments

7   effective November 1, 2018.

8          Mr. Bailey, have you and Mr. DeJong each read the

9   Presentence Report?

10         MR. BAILEY:  We have, Your Honor, and Mr. DeJong has a

11   copy of it in front of him now for reference.

12         THE COURT:  Okay.  And except for the matter to which

13   you made objection relating to the amount of the loss, is there

14   anything in there that you or he thinks is inaccurate?

15         MR. BAILEY:  No, Your Honor.

16         THE COURT:  And Mr. DeJong, did you read the

17   Presentence Report?

18         THE DEFENDANT:  Yes, I did, Your Honor.

19         THE COURT:  And other than the amount of the loss, is

20   there anything in there that you think is not correct?

21         THE DEFENDANT:  No, sir.

22         THE COURT:  Okay.  You may be seated.

23         All right.  So let's go to the Presentence Report.

24   Both the government and the defendant object to the amount of

25   the loss as it's calculated in the Presentence Report.  To put

1    this in perspective, in their plea agreement the parties agreed

2    that the amount of the loss concerning the fraud, the scheme to

3    which Mr. DeJong pled guilty, was more than $6,500 and less

4    than $15,000, which adds two levels to the calculation of the

5    sentencing guidelines.  The Presentence Report finds that the

6    amount of the loss is in the 15 to $40,000 range because it

7    includes loss in 2015.  The indictment in this case charges a

8    scheme that began January 1, 2016 and went to December 31,

9    2016, but Probation's calculation includes more than $15,000 as

10   I recall for 2015 and more than $1,000 for 2017.

11          As the parties recognize, the guidelines must be

12   calculated based on the amount of the loss regarding the count

13   of conviction and any relevant conduct.  Relevant conduct under

14   section 1B1.3(a)(2) includes conduct that is part of the same

15   course of conduct or common scheme.

16          At the January 28, 2019 guilty plea hearing, I

17   questioned whether the scheme really began -- well, whether the

18   scheme began on January 2016 as charged in the indictment or

19   whether it had begun earlier.  The government told me that it

20   had calculated the loss only for 2016 and in the plea agreement

21   agreed not to calculate the loss for 2015.  I was also told I

22   believe that the Massachusetts State Police had destroyed

23   records for years prior to 2015.

24          The defendant's sentencing memorandum amplifies that

25   the defendant negotiated for limiting the loss for guideline

1  calculations purposes to 2016 in the plea agreement.  But the

2  parties recognize and continue to recognize that the government

3  had and has an obligation to give Probation and the court all

4  the information necessary to calculate the guidelines properly,

5  which is what the Supreme Court in Gall says has to be the

6  starting point of any sentencing.  So I ordered, after the

7  January 28 guilty plea, the government to provide the evidence

8  necessary for Probation and ultimately me to properly calculate

9  the amount of the loss and the guideline range.

10      The government provided evidence or information

11  concerning 2015 and 2017.  It totals, the amount of the loss

12  for those years totals an additional $16,000, roughly, raising

13  the amount of the loss Probation used in the Presentence Report

14  to about $31,000 and adding four levels to the -- four more

15  levels to the guideline calculation -- well, four levels to the

16  base offense level and two more levels than Probation has --

17  than the parties had this in their plea agreement.  So

18  Probation calculates the guideline range to be a total offense

19  level of 12, with a Criminal History Category of 1, guideline

20  range of 10 to 16 months in prison, and that's a Zone C

21  sentence, which the guidelines indicate or advise at least half

22  of which should be served in custody.  The parties' plea

23  agreement calculates the guideline range as a 10-1.  The

24  guideline is a 10-1, with a 6- to 12-month sentencing range,

25  and that's in Zone B.

1          Have I summarized that accurately?

2          MR. GRADY:  Your Honor, the government does not agree

3    that they agreed to withhold information from the court in the

4    plea agreement.  The plea agreement expressly states that there

5    is -- the government -- nothing in the plea agreement limits

6    the government's obligation to provide information.

7          THE COURT:  No.  In fact, you told me that same thing

8    at the Rule 11 hearing, and I don't understand the defendant to

9    be claiming that you had an obligation to withhold information

10   from the court.

11         MR. GRADY:  The court had said something along those

12   lines.  To the extent I misunderstood what the court to say, I

13   apologize.  But I thought I heard the court say the government

14   agreed to withhold information and that's not the case.

15         THE COURT:  My understanding now, and it's been

16   amplified by reading the defendant's sentencing memo, is that

17   the government hadn't analyzed the records for 2015 and

18   Mr. Bailey says in the plea agreement had agreed not to but

19   that you also recognize your obligation to share information

20   with the court, something to that effect.

21         MR. BAILEY:  Yes.  Your Honor, what the negotiations

22   resulted in was the government had indicated that they were

23   planning a possible superseding indictment to include 2015

24   where they were prepared to do a very deep dive in terms of the

25   numbers there.  And we had a number of back and forths within a

timeframe, and the defense lawyer protectionism in me kicked in

and said, Will you put it in writing that you're not going to

do anything with 2015 in terms of the sentencing, and the

government very correctly said, We can't promise what we don't

know.  In order to do that we have to dig into 2015.  If we dig

into 2015, we have to turn that over as relevant conduct.  If

you agree to this as structured now in this plea agreement, we

will stop and we'll move on.

I think that's a fair and accurate assessment of the

context in which this agreement was reached.

MR. GRADY:  I would only clarify very, very briefly,

Your Honor.  The proposed agreement was to forgo additional

charges.  At that point, and I think the statements in the

defendant's sentencing memo reflect this, the government did

not know whether there was relevant conduct for 2015 and did

not yet have the records actually at that point when the plea

was being negotiated.

At no point did the government suggest it would not

provide relevant conduct to the court if it determined that

that existed.  It would stop its investigation in terms of

bringing additional charges for 2015, but the government never

promised to withhold information from the court that was

properly required to be disclosed as relevant conduct.  And in

fact, the court has that now and the defendant is not claiming

that the government breached any promise.

1     MR. BAILEY:  The government didn't breach any promise,

2  and I don't think we're too far apart, but I can tell you what

3  I represented to the court was the way the final conversation

4  went that led to our client agreeing to the plea agreement.

5     THE COURT:  Two things.  One, this brings into sharp

6  focus something that I began to get at in January.  Section

7  6B1.2 of the guidelines says that in the case of a plea

8  agreement that involves an agreement not to pursue potential

9  charges, the court has an obligation to determine for reasons

10 stated on the record that the remaining charges adequately

11 reflect the seriousness of the actual offense behavior and that

12 accepting the agreement will not undermine the mandatory

13 statutory purposes of sentencing or the sentencing guidelines.

14 I didn't know about -- I asked about relevant conduct in

15 January, but I didn't know about it.  I really haven't yet made

16 that determination, and it's something you should be prepared

17 to address.

18     With regard to the potential superseding indictment,

19 was there any discussion about the possibility of bringing

20 conspiracy charges or just adding 2015?

21     MR. BAILEY:  I think it related to adding 2015, Your

22 Honor, and how that might affect the calculations.

23     THE COURT:  All right.  Well, with regard to the way

24 this has been structured, I mean, I asked the question in

25 January because I think -- well, I did articulate some of this.

1    The indictment alleges the scheme began on New Year's Day and

2    ended on New Year's Eve in 2016, which seemed somewhat

3    artificial or arbitrary.  And I noted that at least in one

4    other case, and now I know in three or four other cases, other

5    members of Troop E have been charged with committing the same

6    form of fraud in 2015 and 2016.

7            This is not -- I mean, this is a matter of concern to

8    my colleagues as well as to me and it's not idiosyncratic to

9    the District of Massachusetts.  Section 6B1.4 of the guidelines

10   in the commentary states it is not appropriate for the parties

11   to stipulate to misleading or nonexistent facts even when both

12   parties are willing to assume the existence of such, quote,

13   facts, for purposes of the litigation.  Rather the parties

14   should fully disclose the actual facts and then explain to the

15   court the reasons why the disposition of the case should differ

16   from that which such facts ordinarily would require under the

17   guidelines.  So it seems to me that that principle is

18   implicated here.

19           Mr. Grady, let me ask you this.  On May 10, 2017, then

20   Attorney General Sessions issued a memorandum for all federal

21   prosecutors.  The subject was Department Charging and

22   Sentencing Policy.  Is that still in effect?

23           MR. GRADY:  Yes, Your Honor.

24           THE COURT:  Because again, it seems to me -- well, the

25   memorandum says in part prosecutors must disclose to the

1 sentencing court all facts that impact the sentencing

2 guidelines or mandatory minimums and should in all cases seek a

3 reasonable sentence under the factors in 18 United States Code

4 Section 3553.  In most cases recommending a sentence within the

5 advisory guideline range would be appropriate.  Recommendations

6 for sentencing departures or variances require a supervisory

7 approval and the reasoning must be documented in the file.

8          I mean, it seems to me that it's the department policy

9 to follow the guidelines, give judges the relevant information,

10 including concerning relevant conduct, if there's a decision to

11 forgo a charge that could have been brought, potential charge,

12 and then to argue what you think the right sentence is.  And

13 then, I mean, this has some particular relevance, when I think

14 eight people have been charged in this court, troopers or

15 Massachusetts State Police employees have been charged and the

16 argument is, well, Judge Stearns, you know, didn't send Chin

17 away.  He gave him a day.  But Chin was just indicted for 2016.

18 Did the government look to see if there was relevant conduct

19 regarding Chin and tell Judge Stearns about it?

20          MR. GRADY:  There was no ability to calculate 2015

21 conduct for Officer Chin.

22          THE COURT:  Why?

23          MR. GRADY:  The evidence wasn't available.  It simply

24 didn't exist.

25          MR. CHAO:  I can answer this question.  Your Honor, I

handled the Chin prosecution.  These cases, although they're
charged in a group of eight troopers, as Your Honor is aware
since you've looked at the cases, they're apples and oranges.
Every trooper found different ways in which to defraud the
State Police.  There was no --

THE COURT:  Well, actually, I didn't look at them that
closely.

MR. CHAO:  Just to inform the court, there was no
similarity with the way that fake tickets were actually
submitted to the State Police.

THE COURT:  Wait a minute.  Apples and oranges?  Did
they all misrepresent how many hours they worked?

MR. CHAO:  Your Honor, the government believes --

THE COURT:  May I finish the question?  May I finish
the question?  Did they all misrepresent how many overtime
hours they worked?

MR. CHAO:  My statement, Your Honor, was that they had
chosen different ways to submit fraudulent tickets and that
some of the ways that they submitted fraudulent tickets were --

THE COURT:  Could you answer my question?  And then
you can go on.  Did they all misrepresent the number of hours
they worked overtime?

MR. CHAO:  Yes.

THE COURT:  And did they submit fraudulent citations
as part of that?

1            MR. CHAO:  Yes.  Getting back to Chin.  Chin, we were
2    unable to place in a specific cruiser.  So the data was not the
3    same for each trooper in this case.  So there were some that we
4    were able to place in cruisers, and that was significant, as
5    the court knows, because a lot of the information that was
6    gathered in the prosecution's case depended heavily upon the
7    transponder and the GPS information for each trooper and radio
8    information.  So with respect to Officer Chin, we could not
9    place him in a cruiser for the period of 2015.

10            THE COURT:  Did he submit -- did you look at the
11   citations for 2015?

12            MR. CHAO:  Yes, we did.  We did request the citations
13   for Officer Chin.  We did a review of the 2016 citations.  The
14   review showed that what we place, as reflected in the
15   complaint, that we charged him with those fraudulent tickets
16   that he submitted in October of 2016.

17            THE COURT:  In October?

18            MR. CHAO:  October of 2016, correct.

19            THE COURT:  And was there a pattern that emerged?  I
20   mean, I can't really get too deeply into these other cases.
21   But particularly in light of the -- I mean, am I right that
22   part of the scheme involved -- I mean, they worked some hours,
23   they just didn't work full shifts on occasion and they'd be
24   backed up by other people working those shifts if they made a
25   stop sometimes?

1    MR. GRADY:  The core of the government's charges, Your

2    Honor, was a 666 conspiracy, which at a core was based upon

3    each officer submitting fraudulent tickets claiming to have

4    worked hours they did not.

5    THE COURT:  Here.  You just said a 666 conspiracy.

6    MR. GRADY:  Excuse me.  666 embezzlement charge.  I

7    apologize.  I guess the court has put that word in my mind.

8    It's a 666 embezzlement charge based upon the submission of

9    fraudulent tickets claiming to be somewhere they were not.

10    To return to what AUSA Chao said with respect to the

11    methodologies, there was not a pattern.  I think the court is

12    now asking was there a pattern between the various ways it was

13    committed.  This defendant, for instance, created bogus

14    citations during his regular shift and changed the times to

15    make it look like he was working an AIRE shift that followed

16    his regular shift.  In other cases, in the case of Gary Herman,

17    we had an individual who reused old tickets.  He simply took

18    old tickets that he issued in for instance April of 2016 and

19    said he issued them in June during AIRE shifts that he didn't

20    work.  He did that repetitively.

21    Other individuals, Greg Raftery on instances ran

22    plates in the morning of cars that simply drove by.  He used

23    the information to create bogus citations, and instead of

24    saying that they were issued at 8:00 a.m. he said they were

25    issued at 8:00 p.m. during AIRE shifts he was supposed to be

1 working that he didn't work.

2       And what AUSA Chao was saying to this court was that

3 all of the defendants seemed to have different ways of going

4 about carrying out creating these false tickets and carrying

5 out this scheme for their individual cases.

6       THE COURT:  We may, I think will, come back to this

7 but it's not immediate.  I'm just emphasizing that the

8 guidelines under the directions of the Attorney General, which

9 are internal to the executive branch, require disclosing the

10 information to courts, the information necessary to properly

11 calculate the guideline range, which is only a starting point,

12 and ultimately the issue is what sentence is sufficient and no

13 more than necessary.

14       MR. BAILEY:  Your Honor, if I may, just somewhat

15 apropos of that, using a little bit of my background and

16 experience.  I think this court is probably aware there has

17 been somewhat of a change in this office's and other offices'

18 approaches to criminal targets.  It is very common for me to be

19 contacted pre-charge by the U.S. Attorney's Office saying, you

20 know, we have your client, come in now and agree to these

21 charges.  We can have an information.  We won't even complete

22 the grand jury.  That never happened or rarely happened years

23 ago.  That happened in this case.

24       I was contacted as early as August.  Plead to 2016,

25 Zone B, 6 to 12 months.  Same thing came after the indictment.

And these are plea negotiations, plea discussions.  I understand that and I'm --

THE COURT:  Go ahead.

MR. BAILEY:  I understand that and I know that's out there, but this is how the system is predicated these days.

THE COURT:  I'm sorry.  Say that again.

MR. BAILEY:  This is how the system of case resolution is predicated these days.  We know about relevant conduct.  We're all aware of that.

THE COURT:  Yeah, you are.  And I didn't get the sense that either of you were surprised when I asked the question in January.  I mean, you anticipated I might, correct?

MR. BAILEY:  When you raised it, it did not surprise me that you raised it.

THE COURT:  But I mean, here is the point.  In 1987 we went to the sentencing guidelines, which were intended to do two things:  promote truth in sentencing and diminish unwarranted disparity to make sure that people who were similarly situated -- to maximize the likelihood that people similarly situated would be treated similarly.  So it's kind of a modified real offense system.  And this is why relevant conduct is -- the fact that certain charges aren't brought is not supposed to affect the calculation of the guideline range or ultimately the sentence.  And that actually wasn't novel -- this is getting really into history.  It wasn't novel in 1987.

Uncharged conduct could be taken into account at sentencing

before the guidelines.

But, you know, I appreciate your candor, and you're

both being careful to educate me because I do have concerns

today as you were in January. But, you know, judges have an

obligation to make the guidelines work the way they're intended

to work and to remind you if there's occasion, and today is an

occasion of, among other things -- well, the relevant conduct

provisions and 6B1.4, which says it's not appropriate for the

parties to stipulate to misleading or nonexistent facts. This

is a corollary of that.

And, you know, it's very important in diminishing

unwarranted disparity. I mean, one of the concerns here --

well, the Sessions memo also says, "First, it is the core

principles that prosecutors should charge and pursue the most

serious, readily provable offense. This policy affirms our

responsibility to enforce the law as moral and just and

produces consistency. This policy fully utilizes the tools

Congress has given us. By definition, the most serious

offenses are those that carry the most substantial guideline

sentence, including mandatory minimum sentences. There will be

circumstances in which good judgment would lead a prosecutor to

conclude that a strict application of the above-charging policy

is not warranted. In that case, prosecutors should carefully

consider whether an exception may be justified. Consistent

1    with longstanding Department of Justice policy, any decision to

2    vary from the policy must be approved by the United States

3    Attorney or a supervisor designated by the U.S. Attorney, and

4    the reasons must be documented in the file."

5         There are many cases in which it's not appropriate, I

6    would think, to approve -- you know, to bring the most serious

7    charge.  I think it is important to exercise judgment.  But it

8    creates the risk of unjustified disparity.  In some cases, you

9    know, the U.S. Attorney says, Well, you know, we're required to

10   bring the most serious charge.  In other cases they don't give

11   the judge the information that even would alert the judge and

12   the public to the fact that there are charges that could have

13   been brought and weren't brought.

14        But the guidelines, as I said, in section 6 also, if

15   there are charges that are forgone, the word that was used

16   today, that 2015 was forgone, I'm supposed to -- I'm required

17   to decide whether that's appropriate when I accept the plea.

18   But if I don't have the information and my colleagues don't

19   have the information, we can't do what we're obliged to do

20   under the guidelines.

21        Let's go to the objection, though.  And the objection

22   is on page 24.  The parties each have the same objection.  The

23   government objects to the PSR's defense level calculation

24   because it is bound by the plea agreement to calculate the

25   guidelines in accordance with section 3 of the plea agreement

1    at page 2, which says two levels are added under section

2    2B.1.1(b) because the loss involved more than $6,500 but less

3    than $15,000.  And the government is bound by its plea

4    agreement, and I'm not encouraging it to advocate anything it

5    didn't agree to, anything that's inconsistent with the plea

6    agreement.

7         It may be that I should hear first from the defendant

8    and then if the government wants to supplement it, okay?

9    Because the defendant has the same objection.  Go ahead.

10        MR. LANZA:  We have a slightly different objection,

11   one that we're not pressing here today, relative to the way in

12   which that precise number was derived by the government.

13        THE COURT:  When you say you have an objection and

14   you're not pressing it today, the objection is the one that's

15   written in the Presentence Report.  Do you have an objection in

16   addition to that, or do you want me to decide the written

17   objection?

18        MR. LANZA:  I apologize, Your Honor.  The defendant's

19   objection I think is differently stated than the government's

20   objection, which is on page 24.  Ours is on page 25.  And we

21   just raised a concern about how that exact number was

22   calculated, but it's not something that we wish to press here

23   today.

24        THE COURT:  Well, you don't press it because it's

25   abandoned in the sentencing memo.  I don't know which of you

wrote the sentencing memo. But it's necessary to make a

reasonable estimate, not a precise estimate, and common -- I

asked the question about 2015 in January because I knew that

other troopers had been accused of engaging in the scheme in

2015 and I wondered whether Mr. DeJong really started his

scheme on New Year's Day and ended it on New Year's Eve. And

the sentencing memo says you need a reasonable estimate.

MR. BAILEY: Judge, I'll accept the blame for the

confusion here. Yes, we are not -- that second piece of this

which we raised just as a point of information is not being

pursued here. We agree with the government's objection as set

forth on page 24 in terms of the --

THE COURT: The issue is why isn't 2015 relevant

conduct or 2017 as well?

MR. BAILEY: Since you've asked the defense, again

you've set forth the law, you've set forth the Attorney

General's memorandum, and I'm simply setting forth legal

practice, practical legal practice.

THE COURT: Okay. I mean, that comes up at a

different place in the process. I have to start by correctly

calculating the guideline range and then decide what's

sufficient and no more than necessary, and I think the

government's going to advocate a six-month sentence, which

happens to be a downward departure or variance. But I have to

correctly calculate the guideline range even if I am not to

1  presume that it's reasonable.

2      MR. BAILEY:  I understand.  And I guess I'm just

3  digging in my heels not just for this case but for posterity in

4  terms of, I think if the parties have come to an agreement,

5  that is what should control, so I'm just putting that on the

6  record.

7      THE COURT:  That's an argument to be considered.

8  Well, my tentative view is that I should deny the objection

9  because 2015 is part of the common scheme and plan.  To the

10 extent that there's money in 2017, it's also part of the same

11 common fraudulent scheme or plan.  And the amounts involved, if

12 they were only $2,000, would bump it up to the next level.

13 Does the government want to be heard on that, though?

14     MR. GRADY:  With respect to the objection, we have

15 nothing to add.

16     THE COURT:  Okay.  Thank you.

17     MR. BAILEY:  And just note our continued objection on

18 that, please.

19     THE COURT:  Yes.  So I'm denying the government's

20 objection 1 and the defendant's.

21     Let's see, objection 2 is resolved.  The defendant's

22 objection 2 is resolved.  It is also denied.

23     And objection 3 resulted in a correction.

24     MR. LANZA:  It doesn't affect the guidelines, though,

25 Your Honor.

1          THE COURT:  Well, they made the correction.

2          MR. LANZA:  Yes.

3          THE COURT:  It's not an enduring objection.

4          MR. LANZA:  Correct, Your Honor.  I just noted it's

5     not one that has any impact on the guidelines.

6          THE COURT:  All right.  Before I calculate the

7     guidelines, though, I have another question.  Actually, I have

8     one more question regarding the objections for the government.

9     I might as well raise it here.

10          In the government's objection, it said that in making

11     the loss estimates for 2015 and 2017 the government relied on

12     records and datasets that are less comprehensive than those

13     that were used to calculate the loss for 2016.  "By way of

14     example, the government does not possess AIRE activity cards

15     for the year 2015 or 2017," and then there's another sentence.

16     Why does the government not have those records for 2015 and

17     2017?

18          MR. GRADY:  For 2015 the State Police informed us that

19     they didn't exist, so it was simply they didn't have the

20     records.

21          THE COURT:  They didn't exist?

22          MR. GRADY:  They didn't have them.  I'm sorry.

23          THE COURT:  Did they exist at one time?

24          MR. GRADY:  My understanding is that they certainly

25     had to have existed in 2015, but the State Police were unable

1  to produce them to us when we requested them in this

2  investigation for the 2015 AIRE cards.

3         THE COURT:  The State Police were unable to produce

4  the records for 2015 when you sought them in -- when did you

5  ask for them?

6         MR. GRADY:  '18.

7         THE COURT:  Because, I mean, this relates to something

8  else that's in the Presentence Report.  I thought there were

9  no -- did you ask for records before 2015?

10        MR. GRADY:  Yes, but the response received was that

11 the overwhelming majority of records from prior to January 2015

12 had been destroyed during their regular record retention

13 process.

14        THE COURT:  They were destroyed as part of the regular

15 record retention?

16        MR. GRADY:  Their regular process, yes.  They had a

17 three-year window is what we were informed.

18        THE COURT:  And your request was in 2018?

19        MR. GRADY:  Yes, Your Honor.

20        THE COURT:  Okay.  What about the 2017 records?  Why

21 didn't you get those in 2018?

22        MR. GRADY:  With respect to the 2017 records, we were

23 talking about one month of the year where this program existed.

24 The government focused its efforts on obtaining the very large

25 amount of data that applied to the two full years during which

the defendants had the opportunity to take advantage of these programs.

The government did obtain a significant portion of the 2017 records, but ultimately, once the plea negotiations reached the point in October of 2018 where a plea had been agreed, the government did not go out and fully complete its efforts to get those final records for the one month in 2017. The government certainly had enough to provide the court with a relevant conduct statement with respect to '15 and '17 that is fully complete and reflects all of the information the government has.

THE COURT:  And I think in the Presentence Report there's an indication that the scheme -- well, it's in paragraph 9.  "Beginning at least by January 2015, Troop E troopers could earn overtime pay by signing up for and working selective traffic enforcement initiatives, including the AIRE and X-Team programs."

Did these programs begin before January 2015?

MR. GRADY:  Yes, Your Honor.

THE COURT:  So do you know when they began?

MR. GRADY:  The government doesn't have a definitive record that it obtained that states when it started.  However, having spoken to a number of officers, these certainly have been around for more than a decade.

THE COURT:  For more than a decade?

1    MR. GRADY:  Yes, Your Honor.

2    THE COURT:  So it's possible the fraud goes back a

3    decade.

4    MR. GRADY:  It is possible.  The government is unable

5    to prove it.  And if the government had sufficient evidence to

6    prove by a preponderance that any defendant had engaged in that

7    behavior prior to the dates you had, so if the government had

8    information prior to 2015 to provide to this court, it would

9    have been provided.  It does not have that.

10   THE COURT:  But this goes to something else you're

11   going to hear about, and this is part of the reason -- I mean,

12   I stated the principles that apply about judicial -- you know,

13   information provided to a judge almost always has to be public,

14   but we couldn't have conducted the sentencing hearing

15   otherwise.  I know he didn't make his proffer to the Attorney

16   General until April 9, less than a month ago, 2019.  But

17   Mr. DeJong wants to tell you about the history of this program,

18   among other things, according to Mr. Bailey at least.  But

19   we'll get to that.

20   Because here -- I now have another concern, and it's

21   just been magnified somewhat.  But even putting aside whether,

22   you know, there's a way to go back before 2015 -- and at some

23   point I understand, you know, the record is complete and

24   decisions are made based on the information that's then

25   available, but I'm concerned that the guideline calculation may

1    still be too low.  Section 1B1.3(a)(1)(b), the relevant conduct

2    provision, requires, "including the amount of loss resulting

3    from jointly undertaken criminal activity, whether or not

4    charged as a conspiracy, that's reasonably foreseeable to the

5    defendant."

6           So I asked you about this on January 28.  And I asked

7    -- this is page 28.  "So there's no claim that Mr. DeJong is

8    responsible for the losses caused by the people he worked

9    with?"  And you answered me, "There's no charged claim.  I

10   don't want to speak to what the court might infer from all the

11   evidence without having provided it to the court.  I don't want

12   to decide for you."  And there is no conspiracy charge.  But if

13   conspiracy existed, it would constitute relevant conduct.

14          And now I know, having read the Presentence Report, it

15   appears from the Presentence Report -- and I think Mr. Chao

16   maybe was beginning to get at this, it now appears from the

17   Presentence Report that this case may involve an uncharged

18   conspiracy or RICO conspiracy, a racketeering enterprise

19   between members of Troop E.  You know, people in the same unit,

20   something that -- it's an organization, it has a structure,

21   engaging in the same type of illegal conduct in the AIRE and X

22   shift programs, filing false claims concerning hours worked and

23   citations written.

24          They may have falsified the citations in different

25   ways, but there seems to be, from the Presentence Report alone,

a kind of interdependence between the troopers, that they were
backing each other up when traffic stops were made, apparently,
reportedly, and any one of them could have blown the whistle on
this.

So it appears that there's strong circumstantial
evidence of a conspiracy or a RICO conspiracy.  And then the
defendants proffer.  And I don't know the terms of the proffer,
or whether this could be used against him.  But, you know,
that's an issue that could be dealt with in a transparent way
if it was presented.  But his proffer as described in the
sentencing memo provides powerful evidence of a conventional
conspiracy or RICO conspiracy.

He talks, among other things, about at least four
people who have not yet been indicted to my knowledge.  Just by
way of example, the sentencing memo on page 10 says, you know,
one person told him, Mr. DeJong, "We've all agreed not to write
tickets today.  It would be best if we were all on the same
page."

I just calculated the amount of restitution in the
judgments or the plea agreements, which would be low because
they only involved a count of conviction, not relevant conduct,
but for the seven other federal defendants, the seven others,
the amount of restitution in the plea agreements or the
judgments totals $131,631.  If that was added to the amount of
the loss attributed to Mr. DeJong, which is I think $31,631,

that takes you to a loss of $162,736.  And that would mean the
guidelines were a 16-1 and the guideline range would be 21 to
27 months.

I don't think I can use today, if I complete this
hearing, a 20- to 27-month starting point because I didn't give
you prior notice of this, but I didn't begin to figure this out
until yesterday afternoon.

But why shouldn't I be considering whether there's
relevant conduct in the form of an uncharged conspiracy here?

MR. GRADY:  I think I want to clarify the court's
question.  Is the court saying this based on the relevant
conduct that was available to the government or based upon the
defendant's admissions that he's made in his sentencing memo?

THE COURT:  No.  I'm saying that based on what was
available to the government, what I got from the Presentence
Report and then it's reinforced and magnified by the
information concerning his proffer.

MR. GRADY:  With respect to this defendant, the
government was constrained by the evidence it had with respect
to this defendant.  The particular AIRE shifts that -- now, to
be clear, there was an egregious lack of oversight.

THE COURT:  Oversight by who?

MR. GRADY:  By the lieutenants, by the people in
charge of this AIRE program.  And I'll explain what I mean in
the context of this explanation if the court will give me the

1  opportunity.

2       THE COURT:  I will.

3       MR. GRADY:  The core of the charges the government

4  pursued against this defendant was that he embezzled money by

5  way of fake tickets, and that was the core of the charges.  It

6  was the core of the proof, that he knew he was doing wrong

7  because no one would lie and create a fake ticket if what they

8  thought they were doing was right or okay or accepted.  And

9  that was the core of the charges for '16, that's the core of

10  the charges for the '15 relevant conduct and the '17 relevant

11  conduct.

12       The particular AIRE shift in which this defendant

13  conducted his scheme, the A, B and C AIREs, were AIRE shifts

14  that took place across the entirety of the Massachusetts

15  Turnpike.  There were generally between two and three and as

16  many as four officers on a given AIRE shift, and there was one

17  lieutenant or sergeant who was officer in charge, in charge of

18  making sure that the officers complied with the rules, that

19  they worked four hours, that they did their jobs.

20       But the reality was Troop E was a troop that spread

21  from Westfield in the furthest western part of the state to

22  Boston, so that lieutenants in Boston would supposedly be

23  supervising troopers doing AIREs in Westfield.  And it is clear

24  that in that circumstance there was never going to be any

25  physical interaction between those individuals.  There was

1  going to be no check-in at the beginning to make sure someone

2  was working, and there was going to be no check-in at the end

3  to make sure someone had worked until the end of the shift.

4  Communications between these individuals was done by cell

5  phone.  They would generally call at the end of a shift with

6  the tickets and numbers.

7          THE COURT:  They called?

8          MR. GRADY:  They used cell phones.  They called the

9  lieutenant --

10         THE COURT:  If you use a cell phone, is that a form of

11  wire fraud?

12         MR. GRADY:  It would be if the government could point

13  to a particular call made by a particular defendant and say

14  that defendant engaged in a communication that -- it's

15  potential, Your Honor.

16         THE COURT:  And I don't know whether, if this was

17  charged as wire fraud, the guidelines would be higher.  But

18  anyway.

19         MR. GRADY:  But coming back to the issue here, this

20  defendant had no oversight with respect to when he performed

21  his AIREs.  As a result, he was able to, on his regular

22  shift -- however the process was, whether he made stops and

23  didn't generate real tickets to the people and simply took

24  their information or he simply ran license plates as people

25  went by -- created false tickets that gave the impression to

1   the State Police when he turned in only that agency copy that

2   he was working when he was not.  That was the evidence the

3   government had, and the government had evidence that in 2016,

4   he did it for that year.

5          THE COURT:  You had evidence -- you had evidence

6   against seven other members of E Troop, if that's what it's

7   called, that was sufficient to charge them in Federal Court for

8   the same thing.

9          MR. GRADY:  Right.

10          THE COURT:  For the same time period.

11          MR. GRADY:  Yes, but I think this comes back to -- the

12   government had evidence of an individual scheme by these

13   individuals.

14          THE COURT:  Six people who work in the same unit

15   committing the same fraud.  I mean, if you had charged it as a

16   conspiracy, you'd argue that that's powerful circumstantial

17   evidence that they were working together.

18          MR. GRADY:  It's not as small of a unit as perhaps as

19   the court thinks.  There are five different barracks spread

20   from Westfield, Charlton, two in downtown Boston with up to 155

21   troopers spread out across that troop.  So if eight of those

22   were engaged in individual abuse of the system that does not

23   necessarily suggest that those individuals necessarily

24   conspired, especially where some were in Westfield.  This

25   defendant was in Weston.  Others were in Boston.  The

1 conspiracy is not nearly as clear as the court suggests, and

2 the government had to prove its case beyond a reasonable doubt.

3 It didn't have evidence of this defendant involved in a

4 conspiracy.

5 　　　　THE COURT:  You told me in January that your

6 investigation was continuing.  Is that still true?

7 　　　　MR. GRADY:  Yes, Your Honor.  Both with -- yes.

8 　　　　THE COURT:  Yes.  Okay.  And part of the reason I

9 didn't delve further in January is I'm trying to balance two

10 important considerations:  One, assuring that I have the

11 information I need to properly calculate the guideline range

12 and sentence, and the other not to have you communicate, at

13 least in public, information that might injure an ongoing

14 investigation.

15 　　　　But, I'm sorry, Mr. Bailey, you want to get up.

16 　　　　MR. BAILEY:  Judge, a few things.  It has come out in

17 our sentencing memo, it's come out in other proceedings, that

18 there certainly did exist a ticket quota program within the

19 Massachusetts State Police, something that all of us who have

20 driven here for years have suspected, but it appears to have

21 been verified.  I would expect that the evidence is that

22 various troopers tried to meet that quota in their own way.  I

23 suspect that some went out and did AIRE plus shifts and did

24 everything in a manner to meet the eight to ten ticket quota

25 that apparently was required of them.  I think others figured

1   out their own way not to have to do it that way.  And our

2   client has admitted to you under oath that he took criminal

3   shortcuts.  He sat through his proffer.  Having done

4   racketeering cases, I can tell you that there was no agreement

5   how to do this.  There was no teaching how to do this.  There

6   was no melding of the minds.  And the reference to the folks

7   out on the road, that was referenced in a manner to suggest how

8   it was that superior officers -- how one could know that

9   superior officers may have been out doing this same type of

10  thing because you could hear somebody saying, "Are you okay on

11  that stop," to a superior officer, and that was a routine for

12  all stops, just, are you clear, are you okay?

13        This has always been projected and presented as an

14  individual liability case.  That's why we've wound up in

15  different courtrooms.

16        THE COURT:  Well, I know it's been presented that way,

17  but your sentencing memo and the essence of the proffer where

18  he gets a call from somebody telling him, We all need to be on

19  the same page, you know, we've agreed we're not going out

20  today, that's a conspiracy.

21        MR. BAILEY:  Well, that may be what someone is

22  communicating to him, and that certainly suggests what that

23  individual --

24        THE COURT:  Well, he's agreeing to it.  Those two

25  people -- ordinarily, you know, when you were a prosecutor or

Mr. Grady or Mr. Chao are prosecuting a conspiracy case, you'd

say this is good evidence.

Look, I'm going to stop on this for now. I don't know

that we're going to finish the sentencing today and in part

because I think another major matter is the defendant's

proffer, but we're not there yet. But I have a question as to

whether I am yet to have all the information I need to make an

informed decision with regard to section 6B1.2. And I know

there's not a formal agreement not to bring a charge, but

there's a tacit agreement not to say charge for 2015 and maybe

not to charge conspiracy, RICO conspiracy, but I don't know.

And I don't know whether the remaining -- I may have a question

as to whether the remaining charges adequately reflect the

seriousness of the offense, but we'll see where we go.

So I've ruled on the objections, and as a result of

that, although -- as a result of my ruling, the total offense

level is 12, the Criminal History Category is 1, the guidelines

are 10 to 16 months in prison, 12 to 36 months supervised

release. There's a fine range of $5,500 to $55,000,

restitution, which is limited to the 2016 count of conviction,

is $14,062.50, and there's a $100 mandatory special assessment.

Do the parties agree those are the guideline ranges

based on my ruling on the objections?

MR. GRADY: Based on your ruling on the objection,

yes, Your Honor.

MR. LANZA:  Yes, based on that ruling.  Thank you.

THE COURT:  All right.  So what then is the government's recommendation and what are the reasons for it, please?

MR. GRADY:  Your Honor, as set forth in the government's sentencing memorandum, the government's recommendation is for a sentence of six months followed by a one-year of term of supervised release, a fine within the guidelines as calculated by the parties in the plea agreement, $4,000 to $40,000, along with the restitution in the amount of $14,062 and the mandatory special assessment.

I won't go long about the facts.  The court seems very familiar with them.

THE COURT:  I may have missed something important.

MR. GRADY:  Well, of course, and I'll hit the high points for certain.  The instant matter, as the court is aware, involved what can only be termed incredibly widespread overtime abuse within what was formerly known as Troop E of the Massachusetts State Police, which was the troop responsible for patrolling the Massachusetts Turnpike.

As the court is aware from the Presentence Report and from the parties' filings, an internal Massachusetts State Police audit found that over 40 members of that unit had been paid for overtime hours that they did not work.  And eight former troopers, including this defendant, have been charged

1 and convicted or pled guilty in this court of embezzling funds

2 from an agency receiving federal funds.

3 In this case, as the government said, it believes the

4 six-month term of incarceration is appropriate. This is

5 consistent with what the government argued in its plea

6 agreement, and the government -- I would just begin with saying

7 the government re-emphasizes its intent to honor the agreement.

8 It argues within the framework established by that agreement.

9 I know the court knows the --

10 THE COURT: Go ahead. Go ahead.

11 MR. GRADY: And I want to make that record clear so

12 that there can be no question the government continues to honor

13 its agreement.

14 THE COURT: And although I've required that you

15 disclose information that you and the defendant knew you would

16 be required to disclose, at least if the court asked for it, I

17 would say you have been very faithfully discharging your

18 obligations under the plea agreement.

19 MR. GRADY: That's all I need to say on that then,

20 Your Honor. Thank you.

21 This is an issue that has arisen before. There have

22 been two individuals previously sentenced, Your Honor. And I

23 will say very similar things today with respect to what I said

24 with respect to the other individuals.

25 I think the court in imposing a sentence on this

1    defendant has to strike a balance between two very different

2    aspects of what are the very same person.  On the one hand,

3    this is a defendant who has served as a law enforcement officer

4    for 30 or more years and at times, as outlined in great detail

5    in the defendant's sentencing memorandum, has done so admirably

6    at personal risk and exemplary at times -- excuse me -- acted

7    at times as an exemplary police officer.

8            Few defendants come before this court with a similar

9    history of public service.  It is certainly not common.  This

10   defendant has had a stable work history for the last 30 years

11   of his life, and he has had virtually no history with the

12   criminal justice system, except perhaps in enforcing the law.

13   And for such an individual, Your Honor, it's important to note

14   I think from the government's perspective that a number of

15   consequences are going to be inevitable for this individual as

16   a result of this crime regardless of whatever sentence this

17   court chooses to impose and regardless of the length.  These

18   charges represent the end of a 30-year career in law

19   enforcement.  They likely preclude any future employment in

20   that field at all.  Certainly the defendant will be cut off

21   both professionally and personally from the community he's been

22   a part of for the last 30 years.  Any pension he earned over

23   that time is certainly in jeopardy, as the court asked us to

24   brief, if not likely forfeit, based on the news reports the

25   government cited to the court.

1          Yet, balanced against this otherwise commendable

2     history, balanced against these inevitable consequences, these

3     already very significant consequences is the inescapable fact

4     that the defendant before the court was a law enforcement

5     officer who chose not to uphold the law but to break it and who

6     chose to use his position and the trust that that position

7     entailed to game the system and to be paid for hours that were

8     never worked and to do so over a very long period of time.

9          To do this, the defendant engaged in a series of

10     coordinated steps outlined in the government's statement of

11     facts to create fraudulent documents on multiple days on

12     multiple occasions throughout the period he was committing this

13     offense, false citations with bogus information, false payroll

14     records, in order to be paid --

15          THE COURT:  How are those citations and records

16     submitted to the Massachusetts State Police or whoever?

17          MR. GRADY:  Well, I'm happy to digress.  So at the

18     time -- and they've since gone to largely electronic

19     formatting.  But at the time there were books of citations that

20     were issued in, you know, 20 citations per book, and there were

21     five copies of each citation, so as one wrote on the top, it

22     was then transferred to the four copies underneath.  Going from

23     memory, just to -- I don't want to get hung up on this.  The

24     copy that went to the person that got the ticket was the top

25     copy.

1    THE COURT:  I'm interested in knowing how -- I'm

2    interested in trying to find out whether there was mail fraud

3    or wire fraud involved in the submission in any part of the

4    defendant's scheme.

5    MR. GRADY:  The government looked at whether the

6    tickets could form the basis of mail fraud, and what we learned

7    was that the tickets were collected -- the agency copies or

8    even the RMV and court copies that were to go to the court,

9    they were picked up by a trooper who drove them to the Registry

10   or to the courts.

11   THE COURT:  All right.  I don't know that this makes a

12   difference, but, you know, there were CJIS inquiries made and

13   other things, and I don't know whether the guidelines would be

14   different if this was wire fraud or not embezzlement.  But why

15   don't you keep going.  This is helpful.

16   MR. GRADY:  Sure.  He created those tickets in order

17   to be paid for multiple shifts that he didn't work and to hide

18   the crime from discovery by his superiors.  In imposing a

19   sentence, the court has to consider --

20   THE COURT:  You said to hide the crime from discovery

21   by his superiors?

22   MR. GRADY:  Sure.  If he hadn't written a ticket,

23   someone would have asked the question about what were you doing

24   for the four hours we're paying you.

25   THE COURT:  Unless they were part of the scheme.

1    MR. GRADY:  There was no evidence that the government

2    -- well, the government didn't have evidence of a conspiracy

3    with this defendant, Your Honor.  And it almost -- well, I

4    don't want to digress too much, Your Honor, but it almost

5    counts against it if he did need to create these fake tickets.

6    It suggests that he needed to justify some paperwork to people

7    that who might have looked, that not every superior would have

8    been in on it.  But I don't want to digress too far.

9        Ultimately in imposing a sentence, the court has to

10   consider it is not merely a crime of opportunity here.  This is

11   not merely a crime of greed.  It is a betrayal of the trust and

12   power placed in the hand of our law enforcement officers.  He

13   betrayed the trust placed in him given the inordinate lack of

14   supervision with respect to this.  Betrayed the trust that was

15   placed in him given the power he had to enforce the laws and to

16   uphold them.  And the court and members of the public can and

17   should expect more, not less, from a law enforcement officer.

18       So in conclusion, the government believes that a

19   sentence, an incarcerated sentence of six months is appropriate

20   followed by a one-year term of supervised release, a fine

21   within the guidelines as calculated by the parties in the plea

22   agreement, along with restitution in the amount of $14,062.50

23   and the mandatory special assessment represents an appropriate

24   sentence in this case, Your Honor.

25       THE COURT:  Well, I think I think you've done a good

1    job of describing the dilemma, but you haven't addressed one

2    thing that I think is very important.  As I'm trying to fashion

3    the sentence -- and there is a dilemma, but there's also a fact

4    that's emerged since I took the defendant's guilty plea, and

5    he's made a proffer to the Attorney General's Office.  It's

6    reported that you weren't interested in it.  He made proffer

7    April 9.  It may have come up late.  But substantial assistance

8    or even an effort to cooperate that doesn't rise to the level

9    of substantial assistance is a significant consideration, in

10   part because it helps the government, but as I regularly say

11   when I get a 5K motion, the most important part of a

12   cooperation to me is the signal that it sends that this person

13   has got the message and is trying to do something constructive

14   after doing something seriously illegal.

15          Mr. Bailey -- the defendant in his sentencing memo

16   says, invites me to order him to continue to cooperate as a

17   condition of supervised release.  You know what information I

18   redacted from the sentencing memo.  It seems to me that might

19   be of great interest and value to you, and it could bear in a

20   material way on what the appropriate sentence is.  So do you

21   want to address that?

22          MR. GRADY:  Sure, Your Honor.  The government offered

23   the defendant -- well, can I just have a second?  I just want

24   to be certain about what I'm saying publicly.

25          THE COURT:  Go ahead.

1          (AUSA Grady and AUSA Chao confer off the record.)

2          MR. GRADY:  Just to the extent the issues of

3    cooperation arise, Your Honor, I would ask to briefly address

4    the court at sidebar.

5          THE COURT:  You can do that, but take a quick look at

6    the defendant's sentencing memo because I think this may now be

7    public.

8          MR. GRADY:  It won't address anything that's public in

9    that memo.

10          THE COURT:  Okay.  I'll see you at the sidebar.

11    (Sealed sidebar discussion removed from transcript.)

12                          *  *  *  *  *

13          THE COURT:  All right.  There's one thing that I'll

14    note for the record.  It's going to come out -- and maybe,

15    Mr. Grady, you'll address it in this context.  It's up to the

16    government whether to file a substantial assistance motion

17    under 5K1.1, but the motion can be filed -- well, upon motion

18    of the government stating the defendant has provided

19    substantial assistance in the investigation and the prosecution

20    of another person who has committed an offense, the court may

21    depart from the guidelines.  It doesn't require cooperation

22    with the federal government.  It talks about substantial

23    assistance in the investigation and prosecution of others.

24          The case written by Judge Becker, Blessed Memory Love,

25    985 F. 2d 732 at 734, explains why the cooperation doesn't have

1  to be with the federal government, and there are cases

2  prosecuted by your office where I'm sometimes told about

3  cooperation with state authorities as a mitigating factor.

4  In addition, even in the absence of a motion under the

5  current jurisprudence, the fact that the defendant is

6  cooperating is part of his history and characteristics and

7  something that I can consider.

8  So is there anything you'd like to say about how I

9  ought to treat this proffer to the Attorney General's Office in

10  determining what sentence is sufficient and no more than

11  necessary?

12  MR. GRADY:  With respect to that, Your Honor, I would

13  say that the court can certainly address it under the 3553(a)

14  factors, and I have no issue with the court doing so.

15  THE COURT:  Okay.  What unit are you in the U.S.

16  Attorney's Office?

17  MR. GRADY:  Public corruption, Your Honor.

18  THE COURT:  Who is the head of the public corruption

19  unit now?

20  MR. GRADY:  You may be familiar with Fred Wyshak, Your

21  Honor.

22  THE COURT:  All right.  I'll also note that Rule 35(b)

23  allows the court to reduce a sentence based on a motion of

24  substantial assistance within a year of sentencing, but I don't

25  know that that would be a very effective vehicle in this case.

1    I encountered Mr. Wyshak 22 years ago -- you're smiling -- when

2    he was working closely with the Massachusetts State Police in

3    the investigation of Whitey Bulger, among others.

4         Mr. Bailey.

5         MR. BAILEY:  Yes, if it pleases the court.  Your

6    Honor, we have requested that this court impose a sentence of

7    one year of probation, six months of that to be served on home

8    confinement.  We understand that restitution will be mandatory

9    in the amount of $14,062.50.  In our opinion, that sentence is

10   sufficient but not greater than necessary to achieve the

11   purposes of the Sentencing Reform Act.

12        Your Honor, I do want to briefly circle back to that

13   part we discussed when working on the mathematical calculations

14   themselves and that is the total offense level of 10 that the

15   parties have agreed to.  And I want to start out by thanking

16   the government for honoring their agreement with the defendant

17   and also at the same time obviously following this court's

18   instructions and suggestions with regard to what data needed to

19   be placed in front of this court.

20        Yes, there have been memos from Thornburgh to Sessions

21   to all in between about how things should be done and how

22   negotiations should occur and transpire.  For the most part,

23   while those are certainly honored and pursued, the way they

24   have been pursued over the years certainly in my experience on

25   both hands is that you eat what you're indicted for.  And, you

1  know, we're going to have discussions and negotiations at

2  various stages.  But you get indicted for this embezzlement

3  charge, don't come back to us and ask for some sort of

4  reduction or something else because you're going to be stuck

5  with that.  And I've not been aware of any change in policies

6  where the parties haven't been free to try to negotiate a

7  particular outcome.  And yes, we have Rule 11(c), which is

8  something admittedly that could have been --

9          THE COURT:  A binding plea agreement.

10          MR. BAILEY:  -- used in this case, and we didn't do

11  that.  And I think that was because the defense had always been

12  clear that, while we understood that you'd be recommending six

13  months, we perceive this agreement as a Zone B and we'd be

14  recommending something less.  And I think that we consistently

15  told that to the government from the earliest stages.

16          THE COURT:  And I don't think the guidelines are

17  intended to discourage plea bargaining.  And sometimes charges

18  may be hard to prove, and if you get a conviction without

19  having to take the risk at trial, that's deserving of a

20  concession.  And there may be other compelling reasons.  But,

21  you know, as I said, in those circumstances, the judge is

22  supposed to be told what the facts are and then we reach this

23  agreement, just what you've done in your sentencing memo.  I

24  would say it's sort of a model of what the guidelines

25  contemplate.  And then if there's charges that have been

1    foregone -- and that was Mr. Grady's word and I think he used

2    the right one right at the outset -- the judge is supposed to

3    decide whether accepting the plea will serve the purposes of

4    sentencing or be inconsistent with them in a way that causes it

5    to be rejected, but if the judge doesn't know -- if there was a

6    plea agreement that says we're going to indict you for 2016 and

7    not for 2015, you know, then I could have considered that more

8    carefully at the Rule 11 hearing.

9           MR. BAILEY:  And again, I will repeat that there was

10   an effort to have in writing we are foregoing 2015, which I

11   initiated.

12          THE COURT:  But that's not in the plea agreement, is

13   it?

14          MR. BAILEY:  I know.  And the response was we can't

15   promise what we don't know, and if we delve into 2015, we will

16   have to reveal that as relevant conduct.  And I just think

17   that, as important as it is for this court to make clear what

18   is required about relevant conduct and to make clear that that

19   is -- those are the dictates of the United States sentencing

20   guidelines, I think it's also just very important to still

21   allow some freedom to the parties, for whatever reasons, to

22   come to an agreement as to what the appropriate offense level

23   should be.

24          THE COURT:  And I give some weight to the -- the

25   sentence has got to be in a reasonable range.  There's not

mathematical precision to it.  So if this was something that
was bargained for, and I have the impression that the
government was operating within a reasonable way, I give some
weight to the fact that, while the defendant had no assurance,
and I asked him at the Rule 11 hearing do you understand nobody
can tell you today with certainty what the guideline range is
for your sentence or what sentence I will impose, and he said
he understood that --

MR. BAILEY:  You did say that.

THE COURT:  There's value to plea bargaining, and I
understand that point, but it's not the only point.

MR. BAILEY:  I understand.  And we've all been
overruled by probation before, too, so that's -- but I just
think this was a -- this wasn't sort of a seat-of-the-pants
negotiation.  This was a negotiation that went back all the way
pre-indictment and then continued, and then there was a
timeframe about, this is the agreement, agree to it, otherwise,
we're going elsewhere with it.

THE COURT:  All right.  I'm not -- I understand that
point, and I don't think it's your strongest one.  What do you
want to address next?

MR. BAILEY:  Well, Mr. Grady and the government have
talked about the offense conduct here and being paid for 140
and one-quarter AIRE hours that the evidence established he
didn't work and 47 and a quarter X-Team hours as well.  My

1  client came into this court, our client, and admitted to you

2  that what he did was wrong, that it was criminal, it was

3  illegal.  I think it is relevant to at least look at the

4  context which was this "You got to write eight to ten tickets

5  quota," which was systemic --

6           THE COURT:  Well, there's nothing that required that

7  he sign up for overtime, was there?

8           MR. BAILEY:  No, but I think in order to place

9  yourself in a position to potentially do it, I think that you

10  would need to be working those particular shifts, and so there

11  was that.

12           THE COURT:  That's so you can make additional money.

13  What did he make, like $63,000 overtime in 2016?

14           MR. BAILEY:  I think that's true.

15           THE COURT:  On top of about 140 or $150,000.

16           MR. BAILEY:  Yes, and you did ask about the pension.

17  That does not go to the pension calculations at all.  And that

18  doesn't mean that Mr. DeJong didn't have a choice not to do

19  this.  It doesn't mean that Mr. DeJong didn't know what he was

20  doing was wrong.

21           THE COURT:  But actually -- why don't you go on and

22  explain the implications of the ticket quota.

23           MR. BAILEY:  The implications are there's just this

24  pressure to go out and get eight to ten tickets because that's

25  the enforcement mandate, and I suppose that's the safe roads

1  initiative; let's just show that we're being aggressive and
2  we're being effective.  And there are issues tied to when you
3  can and can't write tickets.  It becomes very difficult to
4  write tickets when, if you're -- particularly if you're
5  assigned to the Massachusetts Turnpike where it's
6  bumper-to-bumper and cars are going at 15 to 20 miles per hour
7  and yet you still have this quota, and some individuals found
8  their own ways to meet it illegally and criminally.
9          THE COURT:  To meet the quota and to meet the quota
10  without even working the hours.
11          MR. BAILEY:  That is correct.  And that's why
12  Mr. DeJong sat there on January 28 and said, I did this and
13  what I did was wrong.  And that's why he is here ready to be
14  held accountable for it and why he took responsibility for this
15  and why this will eat away for the rest of his life at the
16  career he threw away simply to meet this quota.
17          THE COURT:  So are you arguing he did it because there
18  was a ticket quota?
19          MR. BAILEY:  I'm arguing that I don't think that you
20  can place this in a greed context or a true malevolence
21  context.  I think that you can place this that he committed
22  crimes --
23          THE COURT:  In candor, I'm not arguing with you, but,
24  you know, what you've written and what you've said so far has
25  been helpful to me.  I don't see how it can be put in anything

1  but a greed context. He's not obligated to work overtime. He

2  could have gone home and been with his loving, lovely family.

3  He wanted more money, and he didn't want to be out on the road

4  getting it, so he wrote phony tickets. And I'm trying to

5  figure out how the man depicted in the letters you gave me

6  decided to do this I would say -- I do say -- year after year.

7       I've counted 2015 as relevant conduct, and it may just

8  be lack of evidence that, you know, that's all he can be

9  punished for in terms of calculating the guidelines and the

10  sentence, you know, those 2015 to the beginning of 2017. But

11  this is -- I'm articulating it so you can address it, and I

12  think I know what the answer is, but I need to hear it and

13  maybe hear it from you but also hear it from Mr. DeJong. How

14  does the man depicted in the Presentence Report with regard to,

15  you know, his history and characteristics and the man uniformly

16  described in the letters start doing this day after day almost

17  and year after year?

18       MR. BAILEY: Mr. DeJong will address this court. This

19  court does have an extensive background in public corruption.

20  And sometimes the reasons are as sort of odd, as I've just

21  suggested, you get caught up in a quota system, you start

22  taking shortcuts, it becomes easy, and you do things

23  counter-intuitively and against the law, and then you come in

24  and you admit that you've done it and you plead guilty.

25       THE COURT: Well, I thought you might say that

1  sometimes it's the culture of the organization and you're

2  working with other people who are doing it and profiting from

3  it.  And you've got a choice.  You either go to the FBI or some

4  federal agency and say, I'm working with criminals, or you get

5  on the bus and say, I'll go, too; this is a good way to make an

6  extra $60,000 a year without doing the work.

7          MR. BAILEY:  And I think the fact that Mr. DeJong is

8  one of eight so far who have been prosecuted not for the same

9  manner but for the same crime suggests the systemic aspect to

10 it and cultural aspect to it.  But I'm also --

11         THE COURT:  Because it's right in your sentencing memo

12 on page 9.  You're talking -- he's explaining his proffer.

13 "After observing that many of those within the State Police

14 command structure who helped foster the culture in which the

15 misconduct developed had yet to be prosecuted, he agreed to

16 cooperate."

17         MR. BAILEY:  Yes, Your Honor.

18         THE COURT:  So it's a culture.

19         MR. BAILEY:  I'm a little bit on quicksand here

20 because I don't want to be suggesting to this court that

21 Mr. DeJong is excusing or minimizing what he did.  I want to

22 make it clear that he is accepting full responsibility here and

23 rely on everything in the sentencing memo.  And I think that's

24 why I've used context because I think it's helpful, but I don't

25 want to detract from the fact that Mr. DeJong committed a

1  serious crime and he knows it, and he's ready to make amends

2  for it, which I'll address in further detail.

3        Your Honor, by the same token, I don't think that --

4  while we should not minimize the gravity of the crime, we also

5  shouldn't minimize the history of Mr. DeJong.  57 years old,

6  been married now for 30 years to a loving wife who is here in

7  the courtroom from whom you received a letter, cherished father

8  of two sons who also wrote you letters, had heretofore an

9  unblemished squeaky clean record such that he was eligible to

10 become a police officer in Northbridge and then go to the State

11 Police where he was second in his academy class, where he was

12 number one in fitness, where certainly he was perceived and

13 from time to time used as the poster image of what a

14 Massachusetts state trooper should look like, how he should

15 present, spit and polished by the book.

16        His record outside of that which he has admitted to

17 was not only exemplary but in my opinion for a highway

18 patrolman exemplary and somewhat extraordinary.  I've outlined

19 on page 13 to 15 the incident where he nearly lost his leg by

20 hitting a tripwire when going through a marsh to ferret out a

21 marijuana farm and detonated an explosive device, when he dove

22 into a pond in what turned out to be a fatal accident and

23 extracted two out of three passengers out of a submerged car,

24 when his police work in the town of Brimfield led to the

25 discovery of the body of a priest and ultimate conviction for

1  murder at which his testimony was critical, his first response

2  to a brawl involving the Outlaw motorcycle gang, which not only

3  resulted in prosecutions and convictions but ultimately a

4  crackdown on motorcycle gangs in his region, the OUI arrests

5  that he perfected, when a window was broken and when he tried

6  to extract his arm, he got severe lacerations, the high-speed

7  chase in which he -- an armed individual who had been tasered

8  twice kept going and Trooper DeJong effectuated the arrest.

9  The trooper [sic] actually threw a firearm at Trooper DeJong

10  when he was effectuating the arrest, his off-duty fugitive

11  apprehension --

12          THE COURT:  Yeah.  I've read all of this and any

13  member of the public or media who is sufficiently interested

14  can read it, too, but I don't think you're arguing that that

15  gives him a license to steal.

16          MR. BAILEY:  I'm not arguing that it gives him a

17  license to steal.

18          THE COURT:  I mean, here is the concern.  All of those

19  things are right and they're meaningful, but I don't know how

20  relevant they are.  Because one of my concerns is that if I

21  were to give the probationary sentence you're advocating, it

22  would send a signal to other police officers that, you know, if

23  you do your job, then you can also break the law without formal

24  consequence.

25          MR. BAILEY:  But it also reinforces the 3553 factors

1  in considerations of the whole picture and the whole
2  presentation.
3          THE COURT:  It's relevant and it's part of what, as
4  Mr. Grady I think acknowledged, makes this vexing.  And, you
5  know, his personal history apart from his professional history
6  I think is in some respects more important on that issue.  But
7  at sentencing the court has to consider the nature of the crime
8  and the history and characteristics of the defendant.  The
9  nature of the crime is extremely serious.  If you go outside
10 here and look at what's etched on the building, Brandeis'
11 dissent in Olmstead when the government backs a lawbreaker --
12 the government is the omnipotent teacher.  When the government
13 breaks the law, it encourages people to believe they can break
14 the law and encourages anarchy.  And to give a probationary
15 sentence that you're advocating to a State policeman, absent
16 significant cooperation, might reasonably send a message to
17 people that if you're a private citizen and you embezzle a lot
18 of money, you're going to go to prison, but if you're a
19 policeman and part of the law enforcement establishment, you'll
20 be treated far more favorably.  And that's just one of the
21 concerns.
22          MR. BAILEY:  And Judge, it's Justice Brandeis' words
23 that caused me to tread with caution about the cultural
24 systemic thing, because again, I don't want to downplay the
25 gravity of the offense here.

1    THE COURT:  It doesn't downplay -- no, it wouldn't

2    downplay the gravity of the offense or the fact that what he

3    did was obviously illegal.  I'm sure he never had any confusion

4    about that.  But as I say, you try to figure out how this

5    happens, and his recent effort to cooperate I think is a

6    significant factor in his history and characteristics.

7    MR. BAILEY:  But I do think, Your Honor, that a disk

8    jockey or somebody who wasn't out on the line versus the record

9    of performance is something that the court can take into

10   account.

11   THE COURT:  I'll take it into account.  But, you know,

12   one way to avoid what you're characterizing as the extreme

13   pressure of having to write tickets when you're working

14   overtime, if you don't want the pressure, don't take the

15   overtime.

16   MR. BAILEY:  That's a fair comment and one that I

17   don't think my client would with dispute in any way, Your

18   Honor.

19   So as a result of this, what has Mr. DeJong done to

20   start to make amends and make up for this behavior that's

21   inconsistent with the man in the letters of support and

22   inconsistent with the man that I've just outlined from his

23   bravery and performance of duty?  Well, he resigned from a job

24   that he loved and had worked for 26 years.  He came into this

25   courtroom and admitted guilt.  He did not drag out or draw out

the process. The distance between the initial contact between myself and the government through Mr. Grady where we started negotiations and the actual signed plea was under a three-month period, so his acceptance was early. Regardless of how this court perceives the relevant conduct, it did spare substantial effort, substantial expense by the government, which are factors to be taken into consideration.

Then he went beyond that, Your Honor, and he put his money where his mouth is. When he was approached by the state Attorney General's Office and asked to come in and proffer, he came in and he proffered. I asked them outright if he was a target of their investigation. They said that he was not a target of their investigation.

THE COURT: Here, two things on that. I don't know if in the state vernacular it's the same as it used to be at least in the federal vernacular, there's a difference between a subject and a target.

MR. BAILEY: I had that conversation with --

THE COURT: A target I think is still defined as somebody as to whom the government has enough admissible evidence to indict, and a subject is somebody who is being investigated.

MR. BAILEY: And I vetted that with the State Attorneys General in order to make sure that we were on the same page as that, and the bottom line was there was no

pressure for Mr. DeJong to have to come in and cooperate with them because they were not threatening him with a crime, with a charge, which is usually what prompts proffers, certainly in this courthouse and with the United States Attorneys, and I think that's significant and I've explained and won't reiterate --

THE COURT: You can reiterate it because I think it's one of the most significant things in this sentencing. In other words, you wrote in your sentencing memo he originally declined an opportunity to cooperate with the U.S. Attorney's Office.

MR. BAILEY: And explained why that was. And you're asking me to --

THE COURT: No. Well, here, you might reiterate it -- unless you don't want to. I mean, it's in writing.

MR. BAILEY: It's in writing and it's public, but clearly there were concerns for someone, a son who is still on the job.

THE COURT: Concerns that he would be retaliated against, which, if the Massachusetts State Police has a professional culture they would protect against, but he knows the Massachusetts State Police, your client. No, but the point is he declined originally to cooperate with the federal government, but when he was asked about a month ago, less than a month ago, he cooperated with the Attorney General's Office.

1    And I think probably prosecutors have observed that it

2    sometimes takes a while for people to decide to cooperate, to

3    help the government, and they decline initially and they agree

4    eventually.  But your argument, if I understand it correctly,

5    is he didn't do it because he was threatened with prosecution.

6    He did it because he wanted to get back on the law enforcement

7    side of the ledger.

8            MR. BAILEY:  He wanted to get on the law enforcement

9    side.  He wanted to make amends.  He had come to grips with his

10   concerns that, you know, I as a father, you as a father,

11   probably would have -- might have had in the same

12   circumstances, and he decided that that was how he starts on

13   the road to expiation for what he did, and the phrase we use is

14   coming to Jesus.  People come to Jesus different ways at

15   different times.  The fact is it happened, and the fact is it's

16   still right there and he's still willing, and he did it --

17           THE COURT:  He's still willing to cooperate with the

18   federal government, too?

19           MR. BAILEY:  Yes.  And it was done even after I told

20   him that I had had a conversation with the United States

21   government, who had taken a position for reasons stated that

22   they would not be giving him cooperation for purposes of

23   sentencing based on whatever proffer he might give.  And we had

24   discussion about that, and he said I still want to do it, and

25   I'm still willing to go ahead and do it.  And he did it, and we

1  set forth that, and we appreciated this court's redactions

2  because I think that the reasons are compelling to keep those

3  redactions, and we set that forth in detail at pages 10 to 12.

4       And Mr. DeJong also, as this court knows, was given an

5  opportunity for us to withdraw that from consideration

6  altogether because of this court's very real consideration of

7  the need for transparency, and he still said I now know this is

8  going to come out, I'm committed to this, I'm going to do this,

9  and he did it.  And I think that that's very important.  And so

10  I think the circumstances of this particular proffer, knowing

11  that the U.S. Attorney's Office would not consider it for 5K

12  purposes, knowing that the state was not forcing him on the

13  threat of a charge, really places in context how remorseful

14  Mr. DeJong is.

15       Your Honor, I think another factor are the sentencing

16  comparisons that we outlined in our case.  Trooper Raftery, who

17  had a loss amount, even with the now accepted guidelines range

18  of this court, was $20,000 -- the accepted loss amounts in this

19  court was $20,000 greater than our clients, and he was

20  sentenced to a three -month FCI sentence and whatever the

21  supervised release was.

22       THE COURT:  Mr. Raftery was charged I think for 2015

23  and 2016.

24       MR. BAILEY:  And received three months.  Mr. Chin

25  apparently was charged for 2016, received one day deemed

1  served.  We did include --

2  THE COURT:  I think Mr. Chao was telling me there was

3  much less evidence regarding Mr. Chin.

4  MR. BAILEY:  We did include the Boston police sergeant

5  who just last year was charged with overtime fraud in a

6  three-month period in one year.  I made a little comment about

7  wondering if relevant conduct factored there because I find it

8  odd that just a three-month period informed those particular

9  charges and whether or not that was a plea negotiation.  He

10  received 18 month continuation without finding for a $13,000

11  fraud loss for overtime.  It was established and he admitted

12  that he didn't work.

13  So I think when you place those three sentences within

14  the context of what we're requesting for Mr. DeJong and you

15  factor in the cooperation that we've outlined, the departure in

16  our opinion that we're requesting is supported and is

17  justified.

18  Our client is humbled.  He's ashamed.  He's

19  remorseful.  He's jobless.  As everyone is likely aware, he

20  almost certainly is going to lose his pension.  There may be

21  splash-back on his son.  There's splash-back on him, but he

22  knows what he did is wrong.  I think, Your Honor, between that

23  and our -- whatever it was, 17-page memorandum, I think I've

24  addressed all of the 3553(a) factors that we wanted to rely

25  upon in asking for a sentence of one year probation, six months

1    of which will be served in home confinement, a low end fine of

2    $5,500.  He will be paying the restitution.

3              THE COURT:  Well, he's not going to be ordered to pay

4    restitution for 2015 because restitution only relates to the

5    count of conviction.  So one of the things -- I want to give

6    you a chance to address this -- I'm considering is ordering

7    restitution of that additional at least -- well, not

8    restitution but putting into the fine the amount that he's not

9    being ordered to pay in restitution for 2015.

10             MR. BAILEY:  I'll be prepared to address that if that

11   is what this court is --

12             THE COURT:  Well, now is the time to address it.  I

13   might sentence him shortly.

14             MR. BAILEY:  Judge, I think that given that relevant

15   conduct does not factor into restitution and given that there

16   is already a built-in provision of a fine range, which I

17   believe was fixed in this case of between $5,500 to $55,000,

18   given that my client is now resorting to part-time work and

19   given what we have mentioned about his wife's health concerns

20   that are an issue now for her --

21             THE COURT:  The situation that needs to be monitored

22   every three months?

23             MR. BAILEY:  It does.  In fact, she has an appointment

24   tomorrow as part of the monitoring.  So we would ask for a low

25   end fine range.  However, we understand that if this court's

sort of balancing of the issues is to impose that loss amount

for 2015, we understand, but please do take into account our

client's present circumstances of a temporary job and a wife

with real health considerations.

If this court is to impose a sentence of federal

prison time, we would ask -- and I don't believe there's an

objection, and I think this is supported by the compliance

letter from probation -- that our client receive the standard

42-day-ish period for self-reporting to the facility so

designated, and again, because of health concerns for his wife,

we would ask this court to at least consider a recommendation

of designation to FCI Devens.

Thank you, Your Honor, for your time.  I do know my

client would like to address the court.

THE COURT:  Mr. DeJong, you now have an opportunity

but not an obligation to speak before I decide how to proceed.

I may sentence you today.  It's almost 1:00.  I may not.  You

don't have to say anything if you don't want to, but if there's

something you'd like to say for me to consider, now is the

time.

THE DEFENDANT:  Your Honor, I would like to address

the court, sir.

Your Honor, I want to take this opportunity to

apologize for the conduct I engaged in that has brought me

before you for sentencing today.  My feelings of guilt and

shame from the bad decisions I made traumatize and eat away at me every day, especially because I know others have suffered due to my actions.

As a law enforcement professional, I not only knew better than to engage in the crime I committed, but also I knew I had sworn to uphold and not break the law. Feeling guilty and accepting responsibility for my behavior is the first step I knew I had to make towards starting to make amends for what I have done. And I know I owe and need to do so much more than simply pleading guilty. I'm ashamed to acknowledge to you and to the public that I lacked the good character to make better decisions.

For the rest of my life I'll work hard to reconcile what I did with who I am and those I have wronged and offended. I am embarrassed to admit today I haven't yet figured out how I will make up for all the losses caused by my bad decisions, but I do know this is the time and place to start.

I began my career in law enforcement over 30 years ago. From the first time I donned the uniform, I wore it with pride. Like most young police officers, I had an idealistic notion of how the job was to be performed. I wanted to help people and make a difference in their lives. I sincerely believe I did accomplish this for most of my career. I had the best intentions and was liked and respected by my peers and supervisors alike. I know I did some good on and through my

job.  Sadly, somewhere along the line I lost this vision and got caught up in a culture within a segment of the State Police and as a result, made some very bad decisions.  I blame no one else.  What I did I did by choice.  Because of this I am truly embarrassed and ashamed for my lack of good character.

First I would like to specifically apologize to Your Honor and the government for what I have done.  Second, I want to apologize not only to the Massachusetts State Police who hired and sustained me for 26 years but also to all of the law enforcement officers whose reputations I may have unfairly tarnished as a result of my wrongful actions and specifically the charge of embezzlement to which I have pled guilty.  Because of this I would also like to directly apologize to the majority of men and women in law enforcement who continue to uphold the code of conduct every day as well as to those who believed and trusted in me.

I would next like to apologize to my family, specifically my immediate family.  My wife, Kristin, who is and has been my best friend and confidant for the last 30 plus years.  I would like to apologize to both my sons.  A parent could not ask for two better sons, as both have grown into productive, honorable and hardworking young men.  Last but most particularly, I would like to apologize to my son Nathan.  He's always emulated me and decided to follow in my career path.  He proudly graduated from the State Police Academy in January of

1    2018.  I have to say this was one of the proudest moments of my

2    life.  Being able to pin his badge at the graduating ceremony

3    was a dream come true and one that warrant police officers --

4    few get to experience.  Today is especially hard because I

5    looked forward for so long to working side by side with Nathan

6    and sharing my knowledge, experience and law enforcement

7    connection with him.  Unfortunately that will never happen now,

8    all because of the bad decisions I've made.

9         In sum, I am simply consumed with guilt and shame.

10   Depression and anxiety are with me daily.  I know that the

11   healing process will take a long time, but I look forward to

12   beginning this process to once again being the kind of husband,

13   father, citizen and friend that those who love and who know me

14   will be proud of.  I know and understand that admitting my

15   guilt and placing my sentence in the hands of this court is the

16   only way I can begin to do this.  Again, I accept full

17   responsibility for my actions and I'm ready to be sentenced.

18   Come what may, I promise to do all in my power to restore the

19   universal confidence and trust I once had but knowingly and

20   sadly eventually took for granted.  Thank you, Your Honor.

21        THE COURT:  You may be seated.  Actually, it's 1:00.

22   We're going to recess and I'm going to continue this sentencing

23   for two reasons.  One, I'm not satisfied that I have received

24   the information necessary to correctly calculate the guideline

25   range and to decide whether the government has forgone charging

1   conspiracy in a way that requires me to decide under the

2   guidelines whether the remaining charge adequately reflects the

3   seriousness of the offense and whether sentencing essentially

4   within the guideline range as I tentatively calculated it would

5   undermine the purposes of sentencing statutes and the

6   guidelines.

7       In addition -- and so I'm going to give the government

8   until May 9 to make a submission addressing that concern.  And

9   if part of it ought to be under seal, it may file it under

10  seal.  But I've seen a lot of conspiracy charges in my last 34

11  years, and I don't know what the evidence is, but I do have a

12  concern that the charge that would have tripled essentially the

13  guideline range as the government calculated it was forgone,

14  and I have to determine whether that's occurred and, if so,

15  whether it was essentially reasonable.

16      But more significantly, Mr. DeJong, what you said and

17  what you've done since April 9 are significant factors in what

18  an appropriate sentence would be.  I have to give a sentence

19  that promotes respect for the law.  And you're right, you

20  committed a very serious crime, and you brought dishonor on the

21  Massachusetts State Police, which has in its history some

22  people who have done excellent things, as you did excellent

23  things, some excellent things.

24      But Mr. Grady mentioned Mr. Wyshak.  I mean, 22 years

25  ago I was hearing about the State Police and the bug they

installed at the Lancaster Street garage and a state trooper,

if I remember right, named Bob Long who had a leading role in

that and how possibly a corrupt Massachusetts State policeman

and quite possibly the FBI -- well, actually the FBI

participated and tipped Bulger and Flemmi and their colleagues

off so they would stop using it.  That's part of the

Massachusetts State Police history, too.

        And you're right, what you and your colleagues have

done has dishonored that.  But there's one thing you said that

I disagree with, and you said, you know, your sentencing is the

only way you can begin to repair the damage you've done.  I

don't think so.  What you did in making a proffer to the

Attorney General a month ago began to repair it.  And I've been

told that you're willing to continue to do that even if you get

sentenced.  Is that right.

        THE DEFENDANT:  That's correct, Your Honor.

        THE COURT:  And you're willing to speak to the U.S.

Attorney's Office as well?

        THE DEFENDANT:  That's correct.

        THE COURT:  You can sit down.  I mean, sentencing, and

the sentencing laws recognize this, present dilemmas.  A judge

has to consider the seriousness of the offense and the history

and characteristics of the person.  And you committed a very

serious offense, and you didn't do it just once.  I mean, you

did it over years.  You had plenty of time to decide to stop

1    doing it.  And on the other hand, you've led an otherwise

2    admirable life.  And that creates a dilemma to me, the judge

3    who needs to sentence you.

4           But that dilemma can be alleviated I think if I

5    continue this sentencing for a period of time to let you

6    continue to cooperate with the Attorney General.  And if it

7    turns out the United States Attorney's Office is interested in

8    knowing what's in the still redacted parts of your sentencing

9    memo, I don't know why they wouldn't be interested, and then

10   see if they make a motion based on your substantial assistance

11   either to the Attorney General or to the federal government or

12   both or what you would say and Mr. Bailey would argue should be

13   the implications of that continuing cooperation.  Ordinarily,

14   we don't talk about cooperation publicly, but it is public.

15   It's part of the memo.  And I know you prefer that it be

16   secret, but public proceedings are a way that the public holds

17   judges accountable and prosecutors accountable, the government

18   accountable, and it would have been impossible for me to

19   conduct this hearing and consider your cooperation if it wasn't

20   public.

21          So I'm also ordering that the parties give me a status

22   report a week from now as to where they are in their

23   discussions.  Given the fact that cooperation has been

24   discussed publicly, you know, if there's a justification, it

25   can be filed under seal or it can be filed under seal

1    temporarily, but it might be made public or a redacted version

2    might be.

3          But it's after 1:00 when we would normally recess, and

4    in its current posture -- as I've said, I'm not sure that I've

5    correctly calculated the guideline range because there may be a

6    good reason why you weren't charged with conspiracy but there

7    may not be, so I want to know about that, and seeing the

8    possibility that the dilemma of determining the appropriate

9    sentence will be alleviated if you're given more time to

10   cooperate.  I'll get these reports next week and then decide

11   whether and when to reschedule the sentencing or to continue it

12   for some meaningful period of time, and you can tell me what

13   your respective positions are on that, please.

14         Does anybody want to be heard on that?

15         MR. BAILEY:  I think your directive is clear from the

16   defense perspective.  There's nothing further for us to say.

17   Thank you, Your Honor.

18         THE COURT:  Mr. Grady?

19         MR. GRADY:  We'll report on the status report next

20   week, Your Honor.

21         THE COURT:  Court is in recess.

22         (Recess taken 1:07 p.m.)

23

24

25

1        CERTIFICATE OF OFFICIAL REPORTER

2

3             I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                 Dated this 7th day of May, 2019.

10

11                 /s/ Kelly Mortellite

12                 _____

13                 Kelly Mortellite, RMR, CRR

14                 Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25