UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td>UNITED STATES,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>CRIMINAL ACTION<br>NO. 18-CR-10307-MLW</td></tr>
<tr><td>DAREN DEJONG,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**MEMORANDUM OF BOSTON GLOBE MEDIA PARTNERS, LLC IN SUPPORT OF MOTION TO INTERVENE AND FOR PARTIAL TERMINATION OF SEALING ORDER**

Boston Globe Media Partners, LLC, publisher of the Boston Globe newspaper (the "Globe"), respectfully submits this memorandum in support of its motion to intervene in this case for the limited purpose of seeking the partial termination of the sealing order in effect with respect to the defendant's Memorandum in Aid of Sentencing (Dkt. 53-1).[1] More specifically, the Globe seeks public access to those portions of defendant's sentencing memorandum that concern proffers defendant made to the Attorney General's Office. *See generally* April 29, 2019 Memorandum and Order at 4-6 & n.1 (Dkt. 53).[2]

---

[1] *See generally In re Boston Herald, Inc.*, 321 F.3d 174, 177 (1st Cir. 2003) (noting intervention of media in criminal case for purpose of pursuing access request); *In re Globe Newspaper Co.*, 729 F.2d 47, 50 n.2 (1st Cir. 1984) ("Some courts have held that media representatives may challenge closure orders by appeal if they first intervene in the underlying action.").

[2] The Globe does not seek to terminate those portions of the sealing order that apply to medical information concerning defendant's spouse. *See* April 29, 2019 Memorandum and Order at 6 (Dkt. 53).

## I.   STATEMENT OF FACTS RELEVANT TO THE GLOBE'S MOTION[3]

In early 2018, the Massachusetts State Police ("MSP") announced that an internal audit had revealed that over 40 Troopers were suspected of failing to work some or all of the overtime shifts for which they had been paid within what was then known as Troop E (and since disbanded). Government's Sentencing Memorandum, Dkt. 46 at 1 & n.1. A subsequent FBI investigation resulted in federal embezzlement charges being brought against seven former Troopers (including this defendant) and one former MSP lieutenant. *Id.* at 2. All eight defendants have pleaded guilty to the charges. *Id.* Charges against three former lieutenants also were brought in Massachusetts state court.[4]

MSP records subpoenaed by the government initially could not be found; in June 2019, "the MSP reported to the government it had 'discovered' a 'number of boxes' with these materials. What has not been reported is how these materials were discovered, who discovered them, why they were not previously located, or what state these materials were in when they were discovered." Supplemental Memorandum in Aid of Sentencing, Dkt. 67 at 2 n.1.

Public interest in the operations of the MSP is not limited to Troop E criminal charges. The recent indictment of the former head of the State Police Association of Massachusetts,[5] and other controversies confronted by the MSP,[6] led the most recent MSP union president to write in

---

[3] The Globe recognizes that the Court and the parties need no recitation of the facts of this case or of the cases involving prosecutions of other State Police Officers and therefore limits its discussion to those facts it believes are most relevant to this motion.

[4] *See Commonwealth v. Keefe*, SUCR2018-00762; *Commonwealth v. Giulino*, SUCR2018-00961; *Commonwealth v. Wilson*, SUCR2018-00763.

[5] *See United States v. Pullman*, D. Mass. 1:19-cr-10345-DPW.

[6] *See* "The governor promised State Police reforms. A year later, results are mixed," *The Boston Globe* (April 26, 2019) (https://www.bostonglobe.com/metro/2019/04/26/year-later-

his resignation letter that the organization is at "one of the lowest points in our history in terms of public perception, political power and stature," facing a "perfect storm of scandal, allegations and mismanagement."[7]

The redacted portions of defendant's sentencing memorandum at issue here concern defendant's proffer to Massachusetts Attorney General's Office that he engaged in overtime abuse in coordination with three other members of Troop E via phone and/or radio communication ("e.g., DeJong and other Troopers would not be writing citations [on a bad weather] day and that he should go home; they agreed not to write citations a certain day; they agreed not to divulge these conversations or attract attention by stopping cars; and they agreed to write tickets prior to certain overtime shifts"). Government's Declaration in Response to Court's May 6, 2019 Order, Dkt. 64 at 1-2.

The three members of Troop E were identified in court papers as Lieutenant A, B, and C. Dkt. 67 at 3. Defendant compared the conduct of those Lieutenants to defendants described in the United States Sentencing Guidelines as "responsible for top-to-bottom wholesale distribution of contraband." Dkt. 67 at 3. "Defendant DeJong corroborated that, on certain occasions -- sometimes during inclement weather -- DeJong would leave an overtime shift early after receiving telephone communications from MSP Lieutenants A and/or B." See ECF Dkt. No. 57 at 10. "On other occasions, DeJong was aware of the fact that MSP Lieutenant C would begin issuing citations prior to an overtime shift with the purpose of using the earlier citations to improperly get credit for

---

massachusetts-state-police-reforms-still-
elusive/XSt7uYfwV8lxhfgm6U6iRJ/story.html?p1=Article_Inline_Text_Link).

[7] See "Mass. State Police union president resigns," The Boston Globe (September 16, 2019) (https://www.bostonglobe.com/metro/2019/09/16/mass-state-police-union-president-resigns/2p0OlahDByqFZPpZejaT9J/story.html).

a later overtime shift, which was not worked." Joint Response to Court's May 17, 2019 Court Order, Dkt. 66 at 1.

Defendant consented to the public disclosure of the fact of his cooperation, "as well as the fact that his decision to cooperate *voluntarily* was made even though he was expressly advised he was not a target of that (or any other related state investigation), that he was not likely to be charged in state court, and that the government had apparently informed state prosecutors that they would not be inclined to credit his state cooperation towards his federal sentence." Dkt. 67 at 5 (emphasis in original).

Although Lieutenants A, B, and C are not identified by name in the public court file, "[b]ased upon information the Attorney General's Office provided to the government on May 3, 2019, the government believes that one of the individuals that participated in some of the above-mentioned activity with defendant DeJong was former MSP Lieutenant 'A,' and that publicly available information indicates that the overtime loss attributable to Lieutenant A was over $18,000 in 2015 and $10,000 in 2016." Dkt. 64 at 2. In the same submission, the government stated that the Massachusetts Attorney General "has also pursued charges against two other former Lieutenants."[8]

The scope of alleged criminal activity of Lieutenants A, B, and C within Troop E is directly relevant to the Court's sentencing decision. As the Court stated during the May 2, 2019 Sentencing Hearing:

> [I]t now appears from the Presentence Report that this case may involve an uncharged conspiracy or RICO conspiracy, a racketeering enterprise between members of Troop E. You know, people in the same unit, something that -- it's an

---

[8] The Globe cannot determine from the government's submission whether the two charged defendants are Lieutenants A, B, or C. Dkt. 64 at 2. *But see* May 2, 2019 Sentencing Transcript at 30 (indicating that defendant appeared to identify at least four people who have not yet been indicted).

organization, it has a structure, engaging in the same type of illegal conduct in the AIRE and X shift programs, filing false claims concerning hours worked and citations written.

They may have falsified the citations in different ways, but there seems to be, from the Presentence Report alone, a kind of interdependence between the troopers, that they were backing each other up when traffic stops were made, apparently, reportedly, and any one of them could have blown the whistle on this.

So it appears that there's strong circumstantial evidence of a conspiracy or a RICO conspiracy. And then the defendants proffer. ... But his proffer as described in the sentencing memo provides powerful evidence of a conventional conspiracy or RICO conspiracy.

He talks, among other things, about at least four people who have not yet been indicted to my knowledge. Just by way of example, the sentencing memo on page 10 says, you know, one person told him, Mr. DeJong, "We've all agreed not to write tickets today. It would be best if we were all on the same page."

***

But why shouldn't I be considering whether there's relevant conduct in the form of an uncharged conspiracy here?

May 2, 2019 Transcript at 29-31.[9]

## II.   ARGUMENT

In its Memorandum and Order of April 29, 2019, the Court ordered that defendant either

(a) file a motion to unseal his original sentencing memorandum, with the understanding that the

court would not consider the information redacted from the public version of the memorandum in

---

[9] *See also* May 6, 2019 Order, Dkt. 60 at 1 ("[T]he court must determine whether there is jointly undertaken criminal activity, including but not limited to an uncharged conspiracy, in order to calculate the Guidelines range for defendant Daren DeJong's sentence."); Dkt. 67 at 3 ("At the time of DeJong's original sentencing hearing, this Court raised concerns it had that statements DeJong made during his proffer with the Massachusetts Attorney General's Office might implicate him in the attribution of loss associated with Lieutenants A, B and C."); May 6, 2019 Order, Dkt. 60 at 1 ("If the government decided to forego alleging jointly undertaken criminal activity, as it agreed to forego charging DeJong for his personal criminal activity in 2015 and 2017, the court must decide whether 'the remaining charge[] adequately reflect[s] the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.' U.S.S.G. §6B1.2(a).").

determining his sentence; or (b) state that he did not intend to file such a motion, in which case the version of the sentencing memorandum from which limited information was redacted by the Court would be docketed for the public record. Dkt. 53 at 8-9.

In so ordering, the Court set forth the standard announced by the First Circuit in *United States Kravetz*, 706 F.3d 47 (1st Cir. 2013) governing the public's common law right of access to sentencing memoranda. Dkt. 53 at 1-4, 6-7. The Court also explained its rationale for redacting limited information from defendant's sentencing memorandum:

> In Exhibit 1 the court has redacted information that is not necessary for it to evaluate defendant's cooperation, but might identify unindicted individuals defendant discussed in his proffer. The redactions are intended to protect the reputations of individuals who have not been charged and will not have an opportunity to attempt to refute defendant's statements to the Attorney General's Office at his sentencing. If, after providing public notice in this Memorandum, the court receives a motion to unseal the information in Exhibit 1 that is redacted, the court will consider the issue *de novo*.

Dkt. 53 at 4-5 n.1.[10]

For the reasons set forth below, the Globe respectfully submits that, given the unique circumstances of this case and the ongoing, legitimate public controversy concerning the operation of the MSP, an order unsealing those portion of the sentencing memorandum concerning defendant's proffer, including the identities of Lieutenants A, B, and C, is warranted under either the common law or the First Amendment.

### A.    The Public Has a Common Law Right of Access to the Sealed Portions of the Sentencing Memorandum.

This Court previously has articulated the legal standard governing the public's common law right of access to sentencing memoranda.

---

[10] The Court also redacted certain medical information concerning defendant's spouse. Dkt. 53 at 6. The Globe does not seek to unseal that information.

A judicial decision "is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny." [Citations omitted.] There is a presumption of public access to judicial decisions in part because public monitoring of the courts is an essential feature of democratic control and judicial accountability. [Citations omitted.] The propriety of making judicial decisions "accessible is accentuated where [as here] the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." [Citing *Federal Trade Commission v. Standard Financial Management*, 830 F.2d 404, 410 (1st Cir. 1987).]

*United States v. Salemme*, 978 F. Supp. 364, 372 (D. Mass. 1997). *See also* Dkt. 53 at 6-7.

Relying on essentially the same rationale, the First Circuit in *Kravetz* expressed "little doubt" that sentencing memoranda are judicial records entitled to a common law presumption of access. 706 F.3d at 56. "For starters, sentencing memoranda, which bear directly on criminal sentencing in that they seek to influence the judge's determination of the appropriate sentence, fall squarely into the category of materials that a court relies on in determining central issues in criminal litigation. We can discern no principled basis for affording greater confidentiality as a matter of course to sentencing memoranda than is given to memoranda pertaining to the merits of the underlying criminal conviction, to which we have found the common law right of access applicable." *Id.*

That is not to say that the common law right of access is absolute. "Though the public's right of access is vibrant, it is not unfettered. Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Siedle v. Putnam Inv., Inc.*, 147 F.3d 7, 10 (1st Cir. 1998). A court must "carefully balance" the presumptive public right of access against the competing interests, while "keeping in mind that only the most compelling reasons can justify non-disclosure of judicial records that come within the scope of the common-law right of access." *Kravetz*, 706 F.3d at 59 (internal quotations and citations omitted).

The Globe recognizes that, in this case, the Court limited its sealing order to "redacted information that is not necessary for it to evaluate defendant's cooperation[.]" Dkt. 53 at 4 n.1. As the First Circuit has recognized, however, the public's common law right of access does not depend on establishing that the information "affect[ed] the sentence." *Kravetz*, 706 F.3d at 58.

> This argument is foreclosed by *Standard Financial Management*. There, we explicitly rejected an approach to public access that would turn on whether the documents at issue actually played a role in the court's deliberations. Instead, we held that documents relevant to the determination of the litigants' substantive rights that came to the attention of the district judge could "fairly be assumed to play a role in the court's deliberations." *Id.* at 409. "To hold otherwise would place us in the position of attempting to divine and dissect the exact thought processes of judges...." *Id.* "To avoid the necessity for such mindreading," we held there, and reaffirm here, "that relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of access applies." *Id.*

*Kravetz*, 706 F.3d at 58.

The primary competing interest against which the public's right of access must be balanced in this case is that the redactions are "intended to protect the reputations of individuals who have not been charged and will not have an opportunity to attempt to refute defendant's statements to the Attorney General's Office at his sentencing." Dkt. 53 at 4-5 n.1. As the First Circuit has recognized, "privacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records." *Standard Fin. Mgmt. Corp.*, 830 F.2d at 411 (internal quotations and citation omitted).

But this exception by no means swallows the rule. Courts should "consider the degree to which the subject matter is traditionally considered private rather than public." *In re Boston Herald, Inc.*, 321 F.3d 174, 190 (1st Cir. 2003) (internal quotations and citation omitted). "Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct *with no public ramifications*, and similar matters will weigh more heavily against access *than*

*conduct affecting a substantial portion of the public*." *Kravetz*, 706 F.3d at 62 (quoting *United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1051 (2d Cir. 1995)) (emphasis added).

In this case, the conduct at issue has significant "public ramifications" affecting a "substantial portion of the public." *Kravetz*, 706 F.3d at 62. Lieutenants of the MSP are public officials whose position in government "has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general interest in the qualifications and performance of all government employees[.]" *Rotkiewicz v. Sadowsky*, 431 Mass. 748, 753, 730 N.E.2d 282, 288 (2000) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). *See generally St. Amant v. Thompson*, 390 U.S. 727, 730 n.2 (1968). As the Supreme Judicial Court has explained:

> Law enforcement officials, from a chief of police to a patrol officer, necessarily exercise State power in the performance of their duties. All police officers are empowered to further the preservation of law and order in the community, including the investigation of wrongdoing and the arrest of suspected criminals. Even patrol-level police officers are "vested with substantial responsibility for the safety and welfare of the citizenry in areas impinging most directly and intimately on daily living: the home, the place of work and of recreation, the sidewalks and streets." [Citation omitted.] Further…, abuse of the office "can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss." [Citation omitted.] ... We conclude, in line with the vast majority of other jurisdictions, that "[t]he abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws." [Citation omitted.]

*Rotkiewicz v. Sadowsky*, 431 Mass. at 753-54, 730 N.E.2d at 288-89. *Cf. Worcester Telegram & Gazette Corporation v. Chief of Police of Worcester*, 58 Mass. App. Ct. 1, 7-8, 787 N.E.2d 602, 607 (2003) ("A citizenry's full and fair assessment of a police department's internal investigation of its officer's actions promotes the core value of trust between citizens and police essential to law enforcement and the protection of constitutional rights."). The public official status of Lieutenants A, B, and C thus weighs heavily in favor of public access.

Nor is this a case in which the information at issue lacks sufficient indicia of reliability. *See Amodea II,* 71 F.3d at 1051 ("The court should consider the reliability of the information. Raw, unverified information should not be as readily disclosed as matters that are verified."). Defendant made a decision to cooperate voluntarily despite being expressly advised he was not a target of any state investigation, that he was not likely to be charged in state court, and that the government had apparently informed state prosecutors that they would not be inclined to credit his state cooperation towards his federal sentence. Dkt. 67 at 5. *See generally Amodea II,* 71 F.3d at 1051.

Although the identities of Lieutenants A, B, and C are not publicly known, the significant publicity about Troop E prosecutions and the MSP's internal audit also favor disclosure. Indeed, publicly available information has aided the government in its assessment of the conduct of those officers, including estimating the overtime loss attributable to Lieutenant A. *See* Dkt. 64 at 2. *See generally Globe Newspaper Co. v. Pokaski,* 868 F.2d 497, 506 n. 17 (1st Cir.1989) (noting that "prior publicity weighs strongly against sealing"); *see also Kravetz,* 706 F.3d at 63.

In sum, the unique circumstances of this case -- in which the MSP faces a "perfect storm of scandal, allegations and mismanagement," and "one of the lowest points in [its] history in terms of public perception, political power and stature," *see* n. 2, *supra* – combined with the significant public interest in the redacted information about allegations of criminal conduct by law enforcement officers, far outweigh any asserted interest in preventing adverse publicity concerning public officials and warrants termination of the sealing order.

**B.      The Public Has a First Amendment Right of Access to the Sealed Materials.**

The public also has a First Amendment right of access to the sealed portions of the sentencing memorandum at issue here.[11]

In determining whether a First Amendment right of access attaches to a particular court document, courts consider two factors: whether the records historically have been open to the general public (the "experience" factor), and whether public access plays a significant positive role in the functioning of the particular process in question (the "logic" factor). *See Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986) ("*Press-Enterprise II*"); *Kravetz*, 706 F.3d at 53-54.

Both factors are present here.   The existence of the common law right of access to sentencing memoranda by itself demonstrates that the records historically have been available to the public. *See generally Nixon v. Warner Communications*, 435 U.S. 589, 597-98 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.   In contrast to the English practice, ... American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit."); *Pokaski*, 868 F. 2d at 503 ("That it could be suggested that our historical tradition has not been one of presumptive openness seems inconsistent with the historical materials available to the framers of the Constitution.").

Nor is there any doubt that public access to sentencing memoranda plays a positive role in the functioning of the sentencing process. *Kravetz*, 706 F.3d at 56-57 ("Public access to sentencing memoranda is consonant with the values animating the common law right. Access to judicial records and documents allows the citizenry to monitor the functioning of our courts, thereby

---

[11] Because the *Kravetz* Court based its ruling on the public's common law right of access, it declined to decide whether the public has a First Amendment right of access to sentencing memoranda. 706 F.3d at 53.

insuring quality, honesty and respect for our legal system.") (internal quotations and citation omitted).

Appling similar reasoning, several courts have held that the First Amendment access right applies to documents filed for use in sentencing proceedings. *See Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) (plea agreements); *Oregonian Publ'g Co. v. U.S. Dist. Ct.*, 920 F.2d 1462, 1466 (9th Cir. 1990) ("the press and public have a qualified right of access to plea agreements and related documents under the first amendment"); *United States v. Haller*, 837 F.2d 84, 86 (2d Cir. 1988) (recognizing right of access to plea agreement redacted of Rule 6(e) material); *In re United States v. Soussoudis (In re Washington Post Co.)*, 807 F.2d 383, 390 (4th Cir. 1986) ("we hold that the First Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases"); *CBS, Inc. v. U.S. Dist. Ct.*, 765 F.2d 823, 824-25 (9th Cir. 1985); *United States v. Santarelli*, 729 F.2d 1388, 1390 (11th Cir.1984) ("[T]he public has a First Amendment right to see and hear that which is admitted in evidence in a public sentencing hearing.").

Unlike a claim under the common law (which is reviewed on appeal for abuse of discretion), First Amendment access claims engender de novo review. *Providence Journal*, 293 F.3d at 10. "In such cases, the presumption in favor of access can only be overcome 'by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Id.* at 11 (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) ("Press-Enterprise I")). "This last requirement adds a new dimension and makes the First Amendment standard even more stringent than the common-law standard." *Id.*

For example, although "[n]o right ranks higher than the right of the accused to a fair trial," *Press-Enterprise I*, 464 U.S. at 508, "the mere invocation of a threat to the accused's Sixth Amendment right to a fair trial" is insufficient to override the public's First Amendment right of access. *Providence Journal*, 293 F.3d at 13. Closure is proper "only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Press-Enterprise II*, 478 U.S. at 14 (emphasis added); *see also Providence Journal*, 293 F.3d at 13.

Even when an overriding interest exists, courts are obligated to "consider all reasonable alternatives to foreclosing the constitutional right of access." *Id.* at 15. Redacting only those portions of the document that are "essential to preserving higher values" is a "time-tested means of minimizing any intrusion on [the public's access] right."). *Providence Journal*, 293 F.3d at 11, 15 (citing *United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995) ("it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document").

Finally, as the First Circuit has cautioned, an order restricting the public's First Amendment right of access to judicial records cannot be based on "conclusory assertions or unsupported speculation," but must be supported by specific findings. *Providence Journal*, 293 F.3d at 13 (citations and internal quotations omitted).

The heightened standard imposed by the First Amendment to justify restricting public access to sentencing memoranda thus provides independent grounds on which to grant the Globe's motion to unseal the portions of the sentencing memorandum concerning defendant's proffer.

### III.   CONCLUSION

For the foregoing reasons, movant Boston Globe Media Partners, LLC respectfully

requests that the Court grant its motion for limited intervention and terminate the sealing order as it applies to the portions of defendant's Memorandum in Aid of Sentencing concerning defendant's proffer to the Attorney General's office.

Respectfully submitted,

**BOSTON GLOBE MEDIA PARTNERS, LLC**

By its attorneys,

/s/Jonathan M. Albano
Jonathan M. Albano BBO #013850
jonathan.albano@morganlewis.com
**MORGAN, LEWIS & BOCKIUS, LLP**
One Federal Street
Boston, MA  02110-1726
Phone:  617-951-8360
Fax:  617-951-8736

Dated:  September 18, 2019

## CERTIFICATE OF SERVICE

I, Jonathan M. Albano, hereby certify that I caused this document to be filed by hand with the court and served electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 18, 2019.

/s/Jonathan M. Albano
Jonathan M. Albano